IDA MARY LOUD v. ST. LOUIS UNION TRUST COMPANY, Appellant.

IDA MARY LOUD, Appellant, v. ST. LOUIS UNION TRUST COMPANY.

Division One, April 12, 1926.

1. **TRUSTEE: Sale of Stock Bought by Testator: Bequeathed by Will.** The fact that mining stock was bought by the testatrix and bequeathed to a trust company as trustee as a part of her estate does not justify the trustee in retaining it if sound business judgment prompts its sale and the investment of the proceeds in other profitable and reasonably safe securities, absent a positive direction in the will that the investment is to be continued by the trustee.

2. ————: **Wasting Investment: Mining Stock: Sale.** It is the duty of a trustee to sell with due diligence wasting investments and convert them into property of a more permanent and profitable, yet reasonably safe, character; and mining stock is regarded as a wasting investment.

3. ————: **Sale of Mining Stock: Speculative Value: Sudden Increase Due to War.** The owner of 1735 shares of mining stock of the par value of one hundred dollars died in 1914, and by will bequeathed to a trust company as trustee her residuary estate, including said stock, with power to sell as the trustee might determine. The business of the company, whose capital stock was 20,000 shares, was largely the mining and smelting of zinc ores in the Joplin district, and during the ten years ending with 1915 the stock had netted an annual dividend of three and one-half per cent, and but one dividend of two and a half per cent during the years 1913, 1914 and 1915, and the average annual dividend paid in the twenty-two years ending with 1915 was only 2.2 per cent. None of the capital stock was listed in the stock exchanges, few shares had been sold in seven years, and the highest price paid was $105. But in March, 1916, a dividend of fifteen per cent was paid, the increase being due to the World War and the cessation of the smelters of Germany, France and Belgium, which countries had been producing sixty-two per cent of all the world's zinc, and it became evident that zinc production in this country would soon be equal to every conceivable call for its use, and the future prosperity of the company would depend upon the duration of the war, which the trustee's officers and others with whom they consulted thought would not likely continue longer than a few months, and these conditions in the opinion of the officers gave to the stock a speculative character.

*Held*, that, bearing in mind the nature and character of the stock and the obligations imposed by law upon a trustee with respect to the retention of unsafe and doubtful investments, it was the duty of the trustee to sell the stock in March, 1916, at a price higher than any shares of stock had ever previously sold and more than twice its par value.

4. ————: **Power to Sell: Short-Term Option.** It cannot be laid down as an inflexible rule that a discretionary power to sell does not include the power to give an option to buy. When a trustee, vested with full power to sell and under an imperative duty to sell, and the giving of a short-term option to buy is the customary and the only reasonable method of effectuating a sale, then the general rule that mediate powers necessary to the performance of the general power granted are implied authorizes the giving of an option. Where the will declared that "the trustee shall have power, at any time and from time to time, to sell any of the trust property or estate, for such price or prices and upon such terms and conditions as it may determine," and a part of the trust estate was mining stock, speculative in character and an unprofitable asset, and it was the duty of the trustee under the circumstances to sell it and the trustee for a period of several months made ineffectual efforts to sell, the giving of a short-term option, as the only method of effectuating a sale, to a well established commission house, to buy the stock for cash, at a price in excess of the price at which the stock had ever previously sold, was a reasonable exercise of the power to sell, and was not void, especially where it was exercised and fully consummated in good faith within the specified time.

5. **OPTION CONTRACT: Unilateral: Consideration: Time and Expense.** A written option given by the trustee to a commission house to buy stock, reciting a consideration of five dollars and "other good and valuable consideration," where the real consideration to the trustee was the optionee's promise to use his best endeavors to sell the stock and to the optionee was the option itself, was not unilateral, but mutually obligatory; but even if at its inception it was unilateral, in that no money consideration passed, it became bilateral where the optionee immediately after it was given set about to find a purchaser for the stock and made several trips at his own expense and time to different cities in an endeavor to effect a sale of it.

6. **TRUSTEE: Sale of Trust Assets to Itself: Remote Relationship.** The mere fact that three of the twenty-five directors of the corporate trustee were stockholders in the corporation to which the mining stock belonging to the trust estate was sold, and that two others were related to other stockholders, does not render the sale presumptively or constructively voidable at the election of the bene-

ficiary. And especially is this true where the effective resolution directing the sale was adopted by a committee of the corporate trustee none of whose members was a stockholder of the corporate vendee or in any wise connected with it, and the agreement made in pursuance to such resolution was signed on behalf of the trust company by its president, who was likewise disinterested, and the directing head and principal stockholder of the corporate vendee was neither a director nor stockholder of the corporate trustee, nor related to any of its officers or directors, and he acted for his company in the negotiations. The relationship in such case is too remote to invalidate the sale, in the absence of proof of actual fraud and bad faith.

7. ———: Sale of Trust Assets: Bad Faith: Without Consultation with Beneficiary. Where the will created a spendthrift trust, authorized the corporate trustee to sell any part of the trust estate in any manner and at any price or time it might determine, and did not require the trustee to consult the beneficiaries in making a sale, the selling of the trust property without consulting them is not proof of bad faith.

8. ———: ———: ———: Inclusion of Stock of Others: Personal Act of President. The inclusion in the option of twenty-five shares of stock which did not belong to the trust estate, and the obtaining of a subsequent release from the option of those shares, by the president of the corporate trustee, without authorization from its directors or committees, were the personal acts of the president, and no proof of bad faith on the part of the trustee in selling 1735 shares of stock belonging to the trust estate.

9. ———: ———:.———: Higher Price than Option Agreement. Where the corporate trustee had given an option to a commission house to buy 1735 shares of mining stock belonging to the trust estate for $250 per share net to the trustee, and the optionee within the option period sold all the 20,000 shares of the mining company at $375 per share, the fact that the trustee thereupon succeeded in obtaining from the optionee an additional sum of $50 per share above the option price for the 1735 shares is not indicative of bad faith on the trustee's part, but rather strong evidence that neither the trustee nor its officers at the time the option was given anticipated that the optionee would make a sale at any such price as $375 per share.

10. ———: ———: Trust Declared Void: Sale without Consent of Beneficiary. The fact that the will creating the trust was declared void in another proceeding, did not make the trustee a mere custodian of the trust estate from the date of the testatrix's death, nor render void a sale of stock belonging to the trust estate, made four

years before the trust was adjudged void and made within the powers by the will vested in the trustee, although the sale was made without the consent of the beneficiary.

11. ———: Compensation: Void Trust: Notice: Chancellor's Discretion. Where the trustee has not been guilty of maladministration, and the will creating the trust has been adjudged void because violative of the rule against perpetuities, he is entitled to reasonable compensation for his services in collecting the assets, converting them into cash and distributing the income; and where he has received notice that the trust is void, by the filing, after such adjudication, of a suit for an accounting, it cannot be held as a matter of law that he is entitled to no compensation for income thereafter distributed, or that he is entitled to no commissions on the fund itself finally distributed, or that he is entitled to no compensation for his services rendered between the time of filing his account to the date of the rendering of the decree, where exceptions thereto are filed; but the compensation to be allowed him rests in the sound discretion of the trial court, and where the amount allowed is supported by evidence and seems to be reasonable this court will not interfere therewith.

12. ———: ———: Attorney Fees. The trustee should be allowed a proper sum to be paid to his attorneys (a) for defending the suit which resulted in having declared void the instrument creating the trust, (b) for defending an exception to his account charging maladministration of the trust fund and (c) for defending a further exception seeking to sur-charge the account; and the trial court is compelled to allow him reasonable sums for such counsel where this court has directed the trial court to enter a decree requiring the plaintiff in the suit which resulted in declaring the will void to pay for the services rendered by the trustee's counsel in the circuit court and in this court, and to tax the costs against the plaintiff.

---

Contracts, 13 C. J., Section 182, p. 335, n. 46. Trusts, 39 Cyc., p. 347, n. 1; p. 350. n. 17; p. 355, n. 53; p. 360, n. 84; p. 362, n. 3; p. 364, n. 30; p. 368, n. 61; p. 480, n. 23; p. 482, n. 34; p. 492, n. 4.

Appeal from St. Louis City Circuit Court.—*Hon. M. Hartmann,* Judge.

REVERSED AND REMANDED (*with directions*).

*Bryan, Williams & Cave, Foristel, Mudd, Hezel & Habenicht* and *James T. Blair* for St. Louis Union Trust Company.

(1)   The trustee having filed its accounts as trustee, the burden is on the plaintiff when she seeks to surcharge its items.   Offenstein v. Gehner, 223 Mo. 318; Vance's Estate, 141 Cal. 624; Estate of Johnson, 11 Phila. 83; Dolenty's Estate, 53 Mont. 33; Woerner on Law of Administration (3 Ed.) p. 1847; Kramme v. Mewshaw, 128 Atl. (Md.) 468.   (2)   Safety is the first consideration in the investments of trust estates.   Mining is a highly speculative enterprise.   Mines are exhausted in the process of working them.   They are a wasting investment. Stock in the Granby Mining & Smelting Company was not a proper investment for trust funds.   The law imposes upon every trustee a duty to sell all wasting investments, including investments in stock of mining companies, and reinvest in sound securities.   Plaintiff admits it.   The authorities are a unit.   Lamar v. Micou, 112 U. S. 476; Loring's Trustee's Handbook (3 Ed.) 106; Cornet v. Cornet, 269 Mo. 298; Underhill on Trusts & Trustees, p. 232; 1 Perry on Trusts (6 Ed.) sec. 439; In re Est. of Buhl, 211 Mich. 124; 28 Halsbury's Laws of Eng., pp. 128, 129.   (3)   Notwithstanding the fact that the Granby stock came to the trustee from Mrs. Blanke, nevertheless it was still the duty of the trustee to dispose of it and dispose of it promptly.   "Retaining improper investments is in effect making them."   Plaintiff's admission included that.   The authorities are uniform.   Babbitt v. Fidelity Trust Co., 72 N. J. Eq. 745; Villard v. Villard, 219 N. Y. 483; In re Hammersley's Estate, 180 N. Y. Supp. 887; In re Jarvis' Estate, 180 N. Y. Supp. 324; 39 Cyc. 410, n. 31; 17 Am. & Eng. Ency. Law, p. 454; 1 Perry on Trusts (6 Ed.) secs. 454, 465; Loring's Trustee's Handbook, p. 106; Willis v. Braucher, 79 Ohio St. 290.   (4)   A failure to sell in such circumstances would, in this case, have rendered the Trust Company liable.   Babbitt v.

Fidelity Trust Co., 72 N. J. Eq. 745; Villard v. Villard, 219 N. Y. 483; Furniss v. Cruikshank, 181 N. Y. Supp. 522; In re Hammersley's Est., 180 N. Y. Supp. 887; In re Jarvis' Est., 180 N. Y. Supp. 324; Loring's Trustee's Handbook (3 Ed.) p. 106; In re Estate of Buhl, 12 A. L. R. 569, note, p. 574; 2 Perry on Trusts (6 Ed.) sec. 547; 1 Perry on Trusts (6 Ed.) sec. 439; Clough v. Bond, 3 Myl & C. 491. (5) Even without the express power given in the will, an authority and duty to sell speculative and wasting property would have been implied from the purpose of the testatrix to have the estate preserved for the benefit of the *cestuis que trustent* in succession. It was a duty incidental to the trust. Underhill on Trusts, p. 232; 26 R. C. L. p. 1285, sec. 136; 1 Perry on Trusts (6 Ed.) sec. 439; 39 Cyc. 346, 347, 409, 410; 28 Halsbury's Laws of England, pp. 128, 129, 31, 32. (6) The trustee, in making the sale of the Granby mining stock, was only called upon to act honestly and in good faith, and exercise such common care, common skill and common caution as an ordinary business man would exercise under similar circumstances and conditions, and it not only acted honestly and in good faith, but exercised more care and skill than a man of ordinary prudence would exercise under similar circumstances and conditions, and it is not responsible merely because other stockholders of the Granby Mining Company received more for their stock. Taylor v. Hite, 61 Mo. 142; Bates v. Hamilton, 144 Mo. 16; 26 R. C. L. 1280, sec. 130; In re Detre's Estate, 117 Atl. 54; Owen v. Campbell, 100 Mich. 34; Lathrop v. Tracy, 24 Colo. 382; Morrow v. County Commrs., 21 Kan. 484; Franklin v. Osgood, 14 Johns (N. Y.) 526. (7) "Infallibility is not exacted of trustees. They must form their best judgment in the light of existent facts." Their actions must be judged in the light of the situation at the time they acted. "It is very easy to be wise after the event; but in order to exercise a fair judgment with regard to the conduct of trustees at a particular time, we must place ourselves in the position they occupied at that

time, and determine for ourselves what, having regard to the opinion prevalent at that time, would have been considered the prudent course for them to have adopted.'' In re Chapman, 65 L. J. 892, 75 L. T. (N. S.) 196; Owen v. Campbell, 100 Mich. 34; Lyon v. Foscue, 60 Ala. 481; Bowker v. Pierce, 130 Mass. 264; Green v. Crapo, 181 Mass. 58; Johns v. Herbert, 2 Apps. D. C. 485. (8) By her will testatrix vested the title in the Trust Company with the duty to manage the estate and keep its funds properly invested, and expressly gave it power to sell ''at any time and from time to time . . . any of the trust property or estate for such price or prices and upon such terms and conditions as it may determine.'' ''The legal title vested in the trustees with power to sell and convey, invest the proceeds, manage the estate and pay the income to the persons designated. The power was, therefore, coupled with an interest.'' The power given the trustee by the will was not a mere naked power. Wallace v. Foxwell, 250 Ill. 616, 50 L. R. A. (N. S.) 632, and note; Wilson v. Snow, 228 U. S. 223. (9) Where the authority is general to perform and carry out a particular object, a resort to the ordinary and usual methods or means comes within the scope of the power. Faulk v. Dashiell, 62 Tex. 648; Smith v. Allen, 86 Mo. 189; 2 C. J. 578, 579, 580; 39 Cyc. 351; Constant v. Servoss, 3 Barb. 141; Cardon's Estate, 278 Pa. St. 157. (a) It will always be inferred that a testator means to give his trustee ''every authority which is necessary for his declared purpose.'' Drake v. Crane, 127 Mo. 85; Schoendorn v. Schmidt, 115 Md. 79; Preston v. Safe Dep. Co., 116 Md. 217; Peck v. Haricott, 6 S. & R. 146. (b) Even a power of sale, itself, will be implied in every case whenever a trustee is directed to do something, the doing of which cannot be accomplished otherwise than by a sale. And this rule applies even to real estate. 26 R. C. L. p. 1285, sec. 136; Robinson v. Robinson, 32 L. R. A. (N. S.) 675, and note p. 676; Porter v. Schofield, 55 Mo. 303; Preston v. Safe Dep. Co., 116 Md. 216; 2 Perry on Trusts (6 Ed.) secs.

764, 765, 766; 39 Cyc. 351.   (10)   In the circumstances in this case, as the evidence plainly shows, the option to Walker & Company was:   (a)   A usual and customary means employed in effecting sales under like conditions, and also:   (b)   It was a means which was proper and, in fact, necessary as a part of the mechanism of the sale. Without it the trustee would not have been able to bring about the sale which it was his duty to make.   The option to Walker & Company not only did not defeat the object of the trust, but it was necessary to prevent its defeat. (11)   The trustee was given express power by the will "at any time and from time to time to sell any of the trust property or estate for such price or prices and upon such terms and conditions as it may determine."   As a necessary preliminary power it had the right to make an executory contract for sale, and also to do as it did in this case—give to a prospective purchaser, for a consideration and for a reasonable time, the privilege or option of purchasing the property.   Newman v. Trust Co., 189 Mo. 423; Connely v. Haggarty, 65 N. J. Eq. 596; Crown Co. v. Cohn, 88 Ore. 642; Meister v. Cleveland Dryer Co., 11 Ill. App. 227; Yerkes v. Richards, 170 Pa. St. 346; Judge v. Pfaff, 171 Mass. 195; Iles v. Martin, 69 Ind. 114; Constant v. Servoss, 3 Barb. 141.   (12)   No officer, director or stockholder in the Trust Company who was in any way interested in Walker & Company either advocated or took any part in the making of the contract with Walker & Company or the sale made in pursuance thereof.   The trustee in that transaction was in no sense dealing with itself, directly or indirectly, and the transaction is certainly not either constructively or presumptively fraudulent.   Cornet v. Cornet, 269 Mo. 298; Hardwick v. Jones, 65 Mo. 54; Wann v. Scullin, 210 Mo. 485; Cummings v. Parker, 250 Mo. 427; Hill v. Gould, 129 Mo. 106; Van Dusen-Harrington Co. v. Jungblut, 75 Minn. 298; Van Huesen v. Van Huesen Charles Co., 74 Misc. (N. Y.) 292; Warren v. Pazolt, 203 Mass. 328.   (13)   The consideration moving from Walker & Company for their con-

tract with the trustee was the promise of Walker & Company to use their best endeavors to bring about a sale of the stock or property of the Granby Mining Company. Warren v. Coal Co., 200 Mo. App. 442; Emerson v. Packing Co., 96 Minn. 1; Mueller v. Bethesda Springs Co., 88 Mich. 390; Spencer v. Taylor, 69 Kan. 493. (14) Even if, however, there had been no consideration for the contract in its inception, nevertheless the minute Walker did any work or suffered any detriment in reliance upon that contract, the contract became bilateral and binding on the trustee. Typewriter Co. v. Realty Co., 220 Mo. 522; Mercantile Trust Co. v. Lamar, 148 Mo. App. 353; Strode v. Transit Co., 197 Mo. 616; Typewriter Co. v. Realty Co., 118 Mo. App. 197; Martin v. Ray County Coal Co., 288 Mo. 255; Green v. Cole, 127 Mo. 587; Glover v. Henderson, 120 Mo. 367; School District v. Sheidley, 138 Mo. 672; Christian University v. Hoffman, 95 Mo. App. 488; Los Angeles Traction Co. v. Wilshire, 135 Cal. 654; Wachtel v. National Journal Co., 176 N. W. 801; Plumb v. Campbell, 129 Ill. 101; Braniff v. Baier, 101 Kan. 117; Corder v. O'Neill, 176 Mo. 401. (15) Plaintiff acquiesced in the sale made by the trustee of the Granby mining stock at the price received by the Trust Company for four years, although fully advised of such sale, and she cannot object to it now. Twin Lick Oil Co. v. Marbury, 91 U. S. 587; Hoyt v. Latham, 143 U. S. 553; Sunnybrook Zinc Co. v. Metzler, 231 Fed. 304; Buchler v. Black, 226 Fed. 703; Warren v. Pazolt, 203 Mass. 328; Kline v. Vogel, 90 Mo. 238. (16) Even if it could be held that the Trust Company is liable because it did not secure for the trust estate a sum equal to the price obtained by other stockholders, yet the trial court was wrong in giving judgment on the first exception for an amount which the undisputed evidence shows was from $78,075 to $104,100 (and interest thereon) in excess of what the actual highest price obtained by any other stockholder would have yielded for the Blanke estate stock. (17) Again, even if it could be held that some amount were recoverable by plaintiff under exception No.

1, yet no interest was allowable and certainly not at the rate allowed by the trial court. (18) The allowance made to the trustee as compensation for its services was inadequate. (a) The trial court correctly ruled that an allowance was proper in this case. Kelly v. Nichols, 19 L. R. A. 413; Beck v. Kinealy, 89 Mo. App. 418; Roth-childs v. Dickinson, 169 Mich. 209; Merry v. Pownall, 67 L. J. (1898) Ch. Div. 162; Cotton v. Graham, 10 Ky. L. Rep. 402; In re Scrimger's Est., 206 Pac. 65; Loud v. Trust Co., 298 Mo. 185. (b) The trial court should have allowed the trustee the full compensation it claimed. Babbitt v. Trust Co., 72 N. J. Eq. 745; Denvir v. Park, 169 Mo. App. 335; In re Scrimger's Est., 206 Pac. 65; Loud v. Trust Co., 298 Mo. 185; Pennsylvania Co. v. Picher, 206 Mo. App. 325. (19) The testimony shows the work done by counsel. None of this is denied. The evidence shows the work done and the testimony of witnesses as to the value of the services rendered shows that the allowances made by the trial court for counsel fees was inadequate.

*Rassieur & Goodwin* for Ida Mary Loud.

(1) The trust in question was void and the property thereof belonged absolutely to the plaintiff, and it was sold without her consent, thereby rendering the Trust Company liable. (a) The Trust Company was bound to know the law and this rule applies especially where it was a professional trustee and advertised and represented itself to be thoroughly competent and qualified. Ashley v. Winkley, 95 N. E. (Mass.) 932; Pierce v. Prescott, 128 Mass. 140. (b) The rule against perpetuities, which the trust violated, is founded on public policy and an individual cannot waive the benefit of it to the detriment of the public. Kales, p. 803, sec. 704. (2) The burden of proof is upon the Trust Company to satisfy the court by a preponderance of the evidence that its conduct in the sale of the Granby shares was proper and not subject to exception. 39 Cyc. 476, sec. (d); Cornet v. Cornet, 269 Mo.

322; Wootton Co. v. Ownbey, 265 Fed. 99; In re Judith Gap Comm. Co., 291 Fed. 795; Parker's Admr. v. Parker, 5 Atl. 586; Ashley v. Winkley, 95 N. E. 932; Taylor v. Burke, 91 Ind. 252; Marvin v. Brooks, 94 N. Y. 71; Stockwell v. Stockwell, 105 Atl. 30; McCulloch v. Tompkins, 49 Atl. 474; Bremmerly v. Woodward, 68 Pac. 1017; Choctaw Ry. Co. v. Sittel, 97 Pac. 363; Ithell v. Malone, 154 N. Y. Supp. 275; Cobb v. Garlington, 84 S. E. 302; Purdy v. Johnson, 163 Pac. 893; Hart's Estate, 203 Pa. 486; Williams v. Petticrew, 62 Mo. 460. (3) The Trust Company, even if it be regarded as a trustee, had only a naked power of sale with respect to the shares in question. (a) The power of the Trust Company is defined by the will, and the character of the security cannot increase or decrease its power. The law is well settled that a trustee has only those powers conferred upon it by the instrument creating that trust. Haldeman v. Openheimer, 126 S. W. (Tex.) 566; Atkinson v. Beckett, 12 S. E. 717; Loud v. Winchester, 30 N. W. 896; Clark v. Maguire, 16 Mo. 302. (b) This is true notwithstanding the trustee may not be guilty of actual fraud. Ashley v. Winkley, 95 N. E. 932; Pierce v. Prescott, 128 Mass. 140. (c) Language similar to the Blanke will has been construed to confer only a naked power of sale. Price v. Courtney, 87 Mo. 387; Garland v. Smith, 164 Mo. 1; 2 Washburn on Real Property (5 Ed.) 707; Dougherty v. Dougherty, 204 Mo. 228. (4) A trustee with power of sale must use diligence in inviting competition and must not act under circumstances of haste or improvidence or contrive to advance the interests of one party at the expense of another. 2 Perry on Trusts (6 Ed.) p. 1276, sec. 770; Matthie v. Edwards, 63 Eng. Rep. 817; Downes v. Grazebrook, 36 Eng. Rep. 77; Gould v. Chappell, 42 Md. 466; Callaway v. Hubner, 58 Atl. (Md.) 362; Chesley v. Chesley, 49 Mo. 540; 28 Halsbury's Laws of England, sec. 308; Tatum v. Holliday, 59 Mo. 422; 26 R. C. L. p. 1289, sec. 140; Harper v. Hayes, 66 Eng. Rep. 88. (5) The Trust Company with only a naked power of sale had no authority to give any-

body an option. (a)  An option is not a sale. Ide v. Leiser, 10 Mont. 5, 24 Pac. 695; Montgomery v. Hundley, 205 Mo. 153; Hopwood v. McCausland, 120 Iowa, 218; Ins. Co. v. Rhea, 123 Fed. 9; Clarke v. American Co., 28 Mont. 468; Benedict v. Pincus, 191 N. Y. 377; Adams v. Coal Co., 230 Ill. 469.  (b)  A trustee with a naked power of sale has no right to give an option. 28 Halsbury's Laws of England, p. 150; 26 R. C. L. p. 1290, sec. 140; Moore v. Trainer, 97 Atl. 462; In re Armory Board, 60 N. Y. Supp. 882; Clay v. Rufford, 64 Eng. Rep. 1337; Trogden v. Williams, 56 S. E. (N. C.) 865; Slaughter Cattle Co. v. Potter County, 235 S. W. 295; Midland County v. Slaughter, 130 S. W. 612; Tibbs v. Zirkle, 46 S. E. 701; Swift v. Erwin, 148 S. W. 267; Ward v. Gartside, 197 Ill. App. 314.  (c) The following additional authorities deny the right of a trustee with a naked power of sale to give and grant an option. Hedgecock v. Tate, 168 N. C. 660; Campbell Coal Co. v. Baker, 83 S. E. 105; Wynkoop v. Shoemaker, 37 App. D. C. 258; Merritt v. Hummer, 122 Pac. 816; Field v. Small, 17 Colo. 386; 1 Mechem's Laws of Agency (2 Ed.) p. 589, sec. 819; Glass v. Rowe, 103 Mo. 513; Ramsey v. West, 31 Mo. App. 676; James on Option Contracts, p. 71, sec. 205.  (d)  No court has ever held that an option for a short time is valid. Many of the cases above cited contain options shorter than the one at bar.  (e)  In the case of Newman v. Trust Co., 189 Mo. 423, the right to give or grant an option by a trustee is not considered.  (f) The case of Connely v. Haggarty, 65 N. J. Eq. 596, is not at all in point.  (g)  The case of Yerkes v. Richards, 170 Pa. St. 346, does not involve the right of a trustee to give an option.  (h)  The case of Hickok v. Still, 168 Pa. 155, is decisive of what the law of Pennsylvania is on the right of a trustee to give an option. (i)  The case of Crown & Company v. Cohn, 172 Pac. (Ore.) 804, is easily distinguishable from the facts in this case.  (j)  A custom is of no avail against the law. Sw. F. & C. Co. v. Stanard, 44 Mo. 71; Martin v. Mill Co., 49 Mo. App. 23; Ober v. Carson, 62 Mo. 209.  (6)  By reason of the relation of

the directors of the Trust Company and their immediate relatives with the Walker organization an option and sale to the Walker organization is void. (a) The statutes relating to the Trust Company provides that the affairs and business of such corporation shall be managed by its board of directors. Sec. 11813, R. S. 1919. (b) The same act relating to the same subject provides that the board of directors shall keep a record of every purchase and sale of securities. Sec. 11818, R. S. 1919. (c) A sale by a trustee to himself, or his immediate relatives, or to another for his own benefit, is void without proof of fraud. The sale in this case was voted for and approved by directors of the Trust Company and by directors who had immediate relatives directly interested in the Walker organization. Thornton v. Irwin, 43 Mo. 153; Grumley v. Webb, 44 Mo. 444; Gaines v. Allen, 58 Mo. 537; Patterson v. Booth, 103 Mo. 402; Van Raalte v. Epstein, 203 Mo. 19. (d) Conduct similar to that under review has already been passed upon adversely by this court. Brooker v. Trust Co., 254 Mo. 125. (e) A sale by four trustees under a will indirectly to two of the co-trustees has been held void. Morse v. Hill, 136 Mass. 60. (f) A trust company sold its own notes to a trust estate, of which it was trustee, and this was held void. St. Paul Trust Co. v. Strong, 85 Minn. 1. (g) It has been held that a sale by a president and his associates to a corporation in which they are directors and officers was void without proof of fraud. Munson v. Railway, 8 N. E. (N. Y.) 355. (h) A sale by a trustee to one of his partners has been declared to be void. Fulton v. Whitney, 66 N. Y. 167. (i) If an agent or trustee directly or indirectly uses or manages for his own benefit the property of the trust, his act is void without proof of fraud. Fisher v. Concord, 50 N. H. 200. (j) It has been held that a sale by a trustee to himself was void without proof of actual fraud. McCallum v. Grier, 68 S. E. 466. (k) A corporation that is trustee cannot sell property to one of its officers, the transaction being void without proof of fraud. Gay v.

Young Men's Inst., 107 Pac. 237. (1) A trustee for the benefit of creditors sold assets at public sale and the attorney for the trustees bought them in. It was held that the sale was void without proof of fraud. Broder v. Conklin, 121 Cal. 282. (m) A sale by a guardian of lands belonging to her ward to the husband of guardian was held void without proof of fraud. Frazier v. Jeakins, 64 Kan. 615. (n) A trustee with power to sell land sold it to a co-trustee, and it was held void. Smith v. Miller, 98 Va. 535. (o) A trustee sold securities belonging to itself to a trust fund, of which it was trustee, and this was held void without proof of fraud. In re Trust Co., 87 N. Y. Supp. 65. (p) A trustee under a deed of trust with power to sell sold property under a foreclosure after a full and fair advertisement and for an adequate price to his wife, and it was held void without proof of fraud. Parks v. Worthington, 109 S. W. 909. (q) A trustee conveyed to a corporation in which he held a majority of stock, and this was set aside without proof of fraud. Otier v. Neiman, 160 N. Y. Supp. 610. (r) A trustee sold property to a partnership in which he was interested, and this was set aside as being void without proof of fraud. Mettler v. Warner, 249 Ill. 341; Roberts v. Weimer, 227 Iowa, 138. (s) A county collector had the duty to sell land for delinquent taxes. He made a sale by one of his deputies, and the property was bought in by a partnership in which the deputy was interested. This was held void without any proof of fraud. Burns v. Edwards, 45 N. E. 113. (t) The following authorities sustain the proposition that a trustee may not sell to himself or his immediate relatives or anyone interested with him, and upon proof of the relationship alone it is void and can be set aside. Perry on Trusts (6 Ed.) sec. 195, p. 315, also sec. 197; Davoue v. Fanning, 2 John. Ch. 252; Wright v. Smith, 23 N. J. Eq. 106. (u) The cause at bar is on all-fours, and has been settled in several cases in favor of the plaintiff. Cartwright & Bro. v. Trust Co., 167 Pac. 436; Gay v. Young Men's Inst., 107 Pac. 237; Purchase v. Atlantic

Trust Co., 81 N. J. Eq. 344. (v) The following additional authorities sustain the proposition that a trustee may not sell to himself or his relatives: Hartman v. Hartle, 122 Atl. (N. J.) 615; McKnatt v. McKnatt, 93 Atl. (Del.) 367; Bank v. Walkley, 53 So. 830; Haynes v. Montgomery, 132 S. W. 651. (7) In order to unearth fraud the court will disregard the existence of corporate fiction and look to the individuals composing the corporation. Ehlers v. Ins. Co., 189 N. W. 159. Equity looks to substance and not to form in an action of fraud. Johnson v. U. Rys. Co., 247 Mo. 361; McCaskill v. United States, 216 U. S. 504; Mangold v. Bacon, 237 Mo. 496; Zeiser v. Cohn, 207 N. Y. 407; Wagg v. Herbert, 215 U. S. 546; Power Co. v. Weisman, 126 N. W. 60; Moring v. Privott, 60 S. E. 509; Cartwright & Bros. v. Trust Co., 167 Pac. 436. However, aside from the case law, it is well settled by statute in this State that a corporate trustee is to be treated as an individual, and the acts of the directors are to be regarded as acts of trustees. Sec. 1180, R. S. 1919. (8) Since the Trust Company had stockholders in common with the Walker organization the court will scrutinize the transaction under review with the greatest care and upon the slightest advantage. (9) The defendant in this case was guilty of converting the shares of Granby belonging to the plaintiff, and being guilty of conversion plaintiff's measure of damage is the par value of the bonds in addition to the cash that was received, there being no evidence that the bonds were worthless, or that there was any market for them, or that there were any individual sales of them. Brinkerhoff-Farris Trust Co. v. Lumber Co., 118 Mo. 447; Shewalter v. Wood, 183 S. W. 1127. (a) Expenses paid out by a trustee in the handling of the estate stand on the same footing and are governed by the same rule that where a trustee is evidence of unconscionable bargain the transaction will be set aside. Wann v. Scullin, 210 Mo. 429; 3 Cook on Corps. (8 Ed.) p. 2527, sec. 662. The law is well settled in this State that directors of a cor-

poration will not be allowed to deal with themselves and for the corporation at the same time. They will be held to account. Ward v. Davidson, 89 Mo. 445; Keokuk Packet Co. v. Davidson, 95 Mo. 467; Brooker v. Thompson Trust Co., 254 Mo. 125; Proctor v. Farrar, 213 S. W. 469. (b) A trustee is not entitled to commissions nor compensation for any reimbursements it pays out unless it has faithfully performed the duties of its office. State v. Berning, 74 Mo. 87; State ex rel. v. Hardy, 200 Mo. App. 409; Cornett v. Cornett, 69 Mo. 298; Newton v. Rebenack, 90 Mo. App. 650; Maginn v. Green, 67 Mo. App. 616; State ex rel. v. Taylor, 112 Mo. App. 585; Folk v. Wind, 124 Mo. App. 577. (10) In any event the plaintiff is entitled to recover $85 upon each share, because this amount is conceded by the defendant to be the market value of the bonds in question, which was part of the purchase price. (11) Plaintiff was entitled to eight per cent interest compounded annually from June 1st. A trustee having been guilty of maladministration is chargeable with the highest rate of interest compounded annually. Pullis v. Somerville, 218 Mo. 624; In re Assignment of Murdoch & Dixon, 129 Mo. 488; State v. Gilmore, 50 Mo. App. 353; Berry v. Berry, 218 S. W. 691; Cruse v. Cruse, 81 Mo. 676; In re Tucker, 74 Mo. App. 331. (12) The lower court erred in making allowance to the Trust Company for commissions. Where a trustee has been guilty of maladministration he thereby forfeits his right to compensation. State v. Berning, 74 Mo. 87; State ex rel. v. Hardy, 200 Mo. App. 409; Cornett v. Cornett, 269 Mo. 298; Newton v. Rebenack, 90 Mo. App. 650; Maginn v. Green, 67 Mo. App. 616; State ex rel. v. Taylor, 112 Mo. App. 585; Folk v. Wind, 124 Mo. App. 577. (a) The trustee in this case is certainly not entitled to any commissions for its services after the institution of this suit, because upon the institution of the suit it had knowledge of plaintiff's claim, and was bound to know what its power and duties were. Ashley v. Winkley, 95 N. E. 932; Pierce v. Prescott, 128 Mass. 140. (b) In no event was

the Trust Company entitled to compensation or commissions after the Supreme Court adjudicated it was not a trustee. In fact, it made no claim for such. This was a voluntary gift on the part of the lower court, and being found guilty of maladministration under the authorities above cited it was not entitled to any such commissions. (c) The court erred in allowing the Trust Company $22,-000 in addition to the foregoing as additional commissions. This was error because the actual administration, shows a loss, and it is so admitted. It was also error because the Trust Company was guilty of maladministration. (d) To allow the commissions given this trustee by the lower court makes it more profitable for it to draw invalid wills and have them set aside. (e) These large allowances have a tendency to offset the amount its account should be surcharged with, and encourages a trustee to commit wrongful acts. (13) The law is well settled that a trustee who seeks to uphold the integrity of a will which violates the law of perpetuities is not entitled to allowances for compensation for its counsel in such action. Bailey v. Sav. Co., 108 N. E. 56. (a) The suggestion in the original opinion in this case that the Trust Company is entitled to compensation for such services could only have been made upon the assumption that the Trust Company had properly performed its duties as trustee. That question was not then in issue. Since then it has been demonstrated that it was grossly guilty of maladministration, and the suggestion of the Supreme Court in its opinion is of no force or effect. (b) In no event should the Trust Company be allowed any attorneys' fees for the defense of its conduct in these proceedings. It was defending its own act, which the court adjudged to be wrong, and there was no reason on earth why one party should pay another's counsel fees under any circumstances. (c) The judgment of the lower court awarding costs and expenses against the plaintiff is in conflict with the mandate. The mandate must prevail. Donnell v. Wright, 199 Mo. 304.

SEDDON, C.—These are cross-appeals from a decree rendered by the Circuit Court of the City of St. Louis after a hearing upon exceptions filed by plaintiff to an accounting filed by defendant of its management of an estate which it had administered as trustee under the will of Mary J. Blanke, deceased, and upon exceptions filed by plaintiff to defendant's claims for allowances for compensation for its services and attorney's fees in the administration of said trust estate. The suit was originally instituted on January 16, 1920, by plaintiff, Ida Mary Loud, who is the daughter and sole heir of Mary J. Blanke, deceased, to have declared void a trust created by the will of Mary J. Blanke on the ground that it violates the rule against perpetuities. This court, in Loud v. St. Louis Union Trust Co., 298 Mo. 148, held the trust void and remanded the cause with directions to the trial court to enter a decree for plaintiff as prayed, and to take an accounting from defendant, St. Louis Union Trust Company, the trustee named in said will, and turn over to plaintiff the property of the trust estate, and to pay the attorneys for defendant Trust Company reasonable counsel fees for services rendered in the circuit court and in this court, and that all costs of the case be taxed against plaintiff. Pursuant to the mandate and directions of this court, the circuit court entered an order requiring defendant to file a true and correct account of its administration of the assets received by it as trustee under the will of Mary J. Blanke, and thereafter defendant filed its accounting, covering its administration of the estate from June 3, 1914, to the date of filing the account, June 14, 1923, approximately nine years. The account is voluminous and is set out in great detail.

Among the assets owned by Mary J. Blanke at the time of her death and passing to defendant as trustee under her will were 1735 shares of the capital stock of the Granby Mining & Smelting Company, a Missouri corporation, which corporation, for brevity, will be referred to hereafter as the Granby Company. This stock had

a par value of $100 per share and defendant, upon taking charge of the estate, charged itself upon its books with $173,500, the par value of said 1735 shares. During the year 1916, defendant sold the 1735 shares of Granby Company stock, receiving therefor the sum of $300 per share, or the aggregate sum of $520,500. Plaintiff's first exception is based upon the sale of said shares of stock, and defendant's appeal is from that portion of the decree sustaining plaintiff's first exception to defendant's accounting and a judgment thereon in favor of plaintiff and against defendant. We will, therefore, first consider the matters raised on defendant's appeal, arising out of the findings and decree of the court pertaining to plaintiff's first exception to the account filed by defendant in the circuit court.

As to the facts bearing upon plaintiff's first exception to the account and defendant's appeal from the trial court's action thereon, we gather the following from an unusually lengthy and voluminous record: The Granby Company was organized in the late fifties or early sixties, at least before the year 1865. Its capital stock in 1916 was $2,000,000, divided into 20,000 shares of the par value of $100 each. It owned certain mineral lands or ore deposits, mainly in the Joplin district in southwest Missouri, but also owned some ore and natural gas deposits in Arkansas and Kansas, as well as certain coal deposits in Illinois. It also owned plants or smelters at or near East St. Louis, Illinois; Granby, Missouri; and Neodesha, Kansas. It is referred to by counsel as a "close corporation," i. e., its stock was largely owned by a comparatively small and selective number of stockholders. During the years 1914, 1915 and 1916 from sixty-five to seventy per cent of its stock was owned and controlled by the Burnes Estate of St. Joseph and members of the Burnes family, so that, as one witness expressed it, "it was practically impossible to interest outsiders in it." In 1909 a voting trust agreement was entered into by the holders of $900,000 of the stock and subsequently enough addi-

tional stock was added so as to place 10,015 shares of the
Granby stock in the voting trust, resulting in the con-
trol and management of the corporation being placed in
this group of majority stockholders. The 1735 shares
held by defendant as trustee under the Blanke will was
not represented in the voting trust or group control of
the Granby Company. The Granby stock was not listed
on any stock exchange and "there wasn't any quoted
market on it at any time." A stipulation in the record
shows that some transfers of the stock were made during
the years 1909, 1910 and 1911, the sale price per share,
with four exceptions, never exceeding par value of $100,
and as to the four exceptions, one sale was for $110, an-
other for $100.25, another for $102.50 and another for
$105 per share. No transfers of the stock were recorded
between December 18, 1911, and November 9, 1915, a
period of about four years. Only one transfer is shown
to have been made during the year 1915 when twenty-
five shares were transferred on November 9, but no sale
price was then recorded for that transfer. In the late
fall of 1915, the Columbia & Fidelity Trust Company of
Louisville, acting as trustee for the Ewald estate, sold
500 shares of Granby stock at a price of $140 per share
to G. H. Walker & Company, a brokerage firm of St.
Louis, hereinafter referred to. This transfer was re-
corded on the corporation books on January 4, 1916. In
February, 1916, three transfers of twenty-five shares at
$200 each and, in March, 1916, three transfers of thirty-
three shares at $192 each, are recorded. The corporation
paid no dividends on its capital stock in the years 1896
to 1901, inclusive, 1903, 1914 and 1915. The per-annum
average of dividends paid in twenty-two years from 1894
to 1915, inclusive, was two and one-fifth per cent. The
average per-annum payment of dividends for ten years
from 1906 to 1915, inclusive, was three and one-half per
cent. A fifteen per cent dividend was paid on March 14,
1916, the day defendant executed the option hereinafter
referred to, but including this dividend, the average div-

idend for eleven years was only four and one-half per cent. This dividend for 1916 upon the 1735 shares of Granby stock owned by the Blanke estate was actually paid to defendant and credited to the account on March 15, 1916.

In the latter part of 1914 or early in 1915, Mr. J. Lionberger Davis became an active director in defendant Trust Company. He had been in the active practice of the law for some years before and at one time president of the St. Louis Chamber of Commerce. His duties with the Trust Company appear to have been to assist in the administration of its trust matters and his particular interest was with the investment of the Trust Company's funds and investments, and those over which the Trust Company acted as trustee. Among his several duties, it was his duty to "study the assets of trust estates, with a view of making recommendations as to any changes in the assets that he thought ought to be made." In looking over the various securities held by the Trust Company in its capacity as trustee, Mr. Davis recommended from time to time the sale of such securities, and the purchase of other securities, as he deemed wise under existing conditions. In looking into the investments of various trust estates, he came across the Blanke estate and the Granby Company stock held by defendant as trustee of that estate. He considered the Granby Company stock as a "highly speculative stock" and, while he did not know much about the Granby Company, he proceeded to get all the statistical information he could obtain on the subject and talked with brokers, bond salesmen and banking houses so as to ascertain if there was any market for the stock, and came to the conclusion, from his preliminary investigation, that it was "a character of security that ought not to be held by the trustee" and recommended to defendant that the stock should be sold, if a market could be found for it. After making his preliminary investigation, Mr. Davis was asked by defendant to make a more careful investigation, which he

did.  He interviewed Mr. Elias Gatch, president of the Granby Company, and Mr. James Grover, a stockholder and director of that company, and talked with two or three of the active banking or brokerage houses in St. Louis and tried to find out if there was a market for the stock.  Mr. Davis learned that the stock had no established market value.  In interviewing Mr. Gatch, Mr. Davis enquired, "If you, acting as trustee for women and children and held stock of this character, would you feel that you were justified in continuing to hold it under present conditions?", and Mr. Gatch replied, "I think you would be greatly criticised if you didn't sell at least half of it."  Mr. Davis then asked Mr. Gatch what he thought the stock was worth and what the Trust Company would be justified in selling the stock for, whereupon Mr. Gatch replied, "I wouldn't buy any at $300 a share and I wouldn't sell any at that price."  No officer of the Granby Company could suggest to Mr. Davis any possible purchaser of the stock.  During the fall of 1915, Mr. Davis, in the course of his investigation, took up the matter of the sale of the stock with G. H. Walker & Company, Smith, Moore & Company, and other stock brokers in St. Louis.  Mr. West of Walker & Company, and Mr. Moore of Smith, Moore & Company advised him that it would be a very difficult thing to sell the stock.  At that time, Mr. Davis was unable to get any bid for the stock. Mr. Davis examined the yearly reports and financial statements of the Granby Company for several years back and investigated the dividend record of the company and came to the conclusion that "this stock, over a period of five years, had returned the beneficiaries of this (the Blanke) estate about three per cent in the form of dividends."

The late World War broke out in August, 1914, resulting in the shutting down of the zinc smelters of Germany, France and Belgium, which in normal times furnished about sixty-two per cent of the world's production of spelter.  An immediate demand arose for high-grade

spelter from the United States, thereby causing the price to advance to a considerable extent. The report of the Granby Company for the year 1914, issued on January 18, 1915, disclosed that "the year 1914 was one of the most unsatisfactory years we have had for a long time in the mining and smelting of lead and zinc ores." On January 22, 1916, the Granby Company issued its report for the year 1915 to the effect that "the year 1915 was tremendously prosperous for those engaged in the mining and smelting of zinc ores; and the outlook for 1916 is good." However, the report sounded this note of caution: "It is wise at this time to direct the attention of our stockholders to certain basic facts. It seems certain that the zinc production capacity of the United States will soon be equal to every conceivable call upon it, for as soon as all of the retorts that are now in process of construction are added to those in action, the production of spelter in the United States will be sufficient to take care of the present spelter requirements of the world. During the latter part of 1914 and the first part of 1915, the dial of fundamental conditions distinctly pointed to higher spelter prices, while to-day the situation is reversed—fundamentals distinctly point to lower prices and smaller profits. However, we can only congratulate you upon the results achieved for the year 1915, and assure you that we will make hay while the sun shines, and garner all possible profits for the year 1916, thus establishing ourselves on such a firm foundation as to warrant our hope and belief that we will be among those who are left after the struggle for the survival of the fittest is at an end." ·

After studying the Granby Company reports for the years 1914 and 1915, and several years prior thereto, Mr. Davis concluded that "the profits of the company were dependent very largely on the continuation of the war, which, of course, made the earnings of the company entirely speculative." Mr. Davis's ultimate judgment of the value of the Granby stock in 1915 was that "$200 a share would be an extravagantly high price to get for it,

and when 1916 came along and the report of 1915 was out, I hoped we might get as high as $250 a share. I thought we might get as high as $250 a share, if we could get someone to gamble on the length of the war.'' From time to time, during the several months Mr. Davis was endeavoring to procure a sale of the stock, he conferred with Mr. Shepley, president of defendant Trust Company, and probably with Mr. Haarstick, its, vice-president, as to the efforts he had been making in endeavoring to find a purchaser for the stock and in trying to get a bid therefor. Finally, after working on the matter for several months, Mr. Moore of Smith, Moore & Company, asked Mr. Davis if the Trust Company would give an option on the stock, so that he (Moore) could use it as a leverage to work out a sale of the stock or bring about a splitting up of the shares into $10 par value in order to make a market for selling the low-priced stock to the general public. Mr. Davis told Moore that he would present the proposition to the Trust Company, but, upon doing so, Davis was informed that an option had already been given to G. H. Walker & Company, which option is hereinafter referred to.

Meanwhile, Mr. Shepley and Mr. Haarstick, officers of defendant Trust Company, had also made some efforts to sell the Granby stock, but with no results. Mr. Shepley had several talks with Mr. Walker of G. H. Walker & Company and at least one conversation with Mr. Gatch, president of the Granby Company. Walker told Shepley in the fall of 1915 that the stock was an unlisted stock, that there had been very little movement in it so far as he could find out, and that the control of the company was vested in the Burnes Estate and he didn't believe he could make a sale at any price. Walker asked Shepley what price the Trust Company expected to get. Shepley told Walker he hoped to get $200 a share, and Walker said he could not do anything with the stock at that price. Shepley testified that Mr. Gatch told him that the Granby Company had done quite well during the year 1915 and

thought the stock should bring from $150 to $200 a share, but that Gatch wouldn't take $250, or possibly $300, for his holdings, because he had married into the Burnes family and the stock furnished an activity for himself and his sons. In the spring of 1916, Shepley saw Walker again about the possible sale of this stock. Walker told him it was useless to try to sell the stock by ordinary means, but if he (Walker) could get an option on the stock for a limited time, he would be glad to work upon it and thought he might possibly interest some people in buying the block of stock. Shepley testified: "Mr. Walker said to me if he could get an option for a reasonable time for $250 a share, he would use his best effort to sell the stock, provided we would let him take for his compensation all over and above $250 a share." As a result of this interview with Walker, either Shepley or Haarstick, or perhaps both, reported Walker's proposition to defendant's Committee on Trust Estates, which committee, at a meeting held on March 14, 1916, on motion of Mr. Haarstick, voted to give an option to G. H. Walker & Company for a period of four months from that date on the 1735 shares of Granby Company stock held by defendant as trustee of the Blanke estate at $250 per share, plus interest at six per cent from said date.

Defendant's by-laws prescribe the duties of its Committee on Trust Estates as follows: "Said committee shall have general supervision of the management, sales and other disposition of all trust estates, and of the investment of all trust funds or other property deposited with the company for investment. It shall meet at such times as it may determine. It shall confer and meet with and report to the Executive Committee and Board of Directors whenever said Executive Committee or said board may prescribe. It may take recommendations to and seek advice from the Executive Committee, Board of Directors or any officers of the company at its pleasure. Any officer or employee of the company shall furnish it any information it may request about any trust estate

or trust property of any kind, and all books, papers and other records of the company shall, at all times, be subject to the inspection of said committee.''

At the meeting of the Committee on Trust Estates held on March 14, 1916, Mr. Haarstick, who was a member of that committee, expressed the belief that the Trust Company ''ought to get rid of this stock.'' A member of the committee testified that at this meeting, Haarstick (who had died before the trial of these exceptions) said ''he had a proposition from Walker & Company; that he had conferred with them, and they said if they could get out and take the matter up that they thought they might be able to do something. Mr. Haarstick said the important thing was that if we waited for a purchaser, we would wait forever; that the stock had not been paying to amount to anything, and now it was on a peak and that it ought to be disposed of, and very promptly. He thought the only way to do was to get somebody to work on it; that he had finally succeeded in getting the promise of Walker to take the matter up, and that he had asked for an option on this stock, to justify him in taking the question up, of $250 a share. Mr. Haarstick said he didn't like giving options. He said, on the other hand, he thought that was the only way we could get a fair value of the property; he didn't think it was worth it. On the other hand, it was so much more than he thought it was worth that he thought the Trust Company was justified in giving the option in order to enable them to get somebody at work on it. Mr. Haarstick reported that he had been to the office of the Granby Company trying to draw an offer from them, and he had exhausted his efforts, and unless something was done to work the thing up, he didn't think he could draw any offer. He said he thought that the option price was so far in advance of anything that he hoped to get that we were perfectly justified in doing it.''

The Walker option agreement was executed by Mr. Shepley, president of the Trust Company, on its behalf on March 14, 1916, and is as follows:

"OPTION CONTRACT.—In consideration of the sum of five dollars ($5) to the undersigned (hereinafter referred to as the 'vendor') in hand paid, and other good and valuable consideration, the receipt whereof is hereby acknowledged, the vendor does hereby offer to sell to G. H. Walker & Company of St. Louis, Missouri (hereinafter referred to as the 'vendee'), and does hereby sell, give and grant unto the said vendee the option or right, until the first day of July, 1916, to purchase seventeen hundred and sixty (1760) shares of stock of the Granby Mining & Smelting Company, now held by the vendor, for cash, at a price of two hundred fifty ($250) dollars per share.

"It is further agreed, in the event of the exercise of the right or option granted hereunder, that any cash dividend, stock dividend, right or privilege declared, paid or granted on said stock between the date hereof and the time limit hereunder shall revert to and become the property of the vendee, or be applied as part payment of the said purchase price; but the vendee, if they shall receive any such dividend, shall pay also interest on purchase price from date at six per cent (6%) per annum.

"This right or option given by the vendor to the vendee to purchase the above stock is based upon a valuable consideration and is irrevocable and may be exercised by the vendee at any time on or before the said first day of July, 1916.

"This offer shall be binding upon the successors and assigns of the vendor, and all rights hereunder may be exercised by and shall inure to the benefit of the executors, administrators, nominees and assigns of the vendee.

"Signed this 14th day of March, 1916.

"ST. LOUIS UNION TRUST COMPANY,

"Trustee Under the Will of Mary J. Blanke,

"By John F. Shepley,

"Prest. 1735

"BERTHA DRAKE SCOTT, 25 shs.

"By John F. Shepley."

It will be observed that the Walker option covered 1760 shares of the Granby Company stock, including 1735 shares belonging to the Blanke estate and twenty-five shares in the name of Bertha Drake Scott. The twenty-five shares were owned by Mrs. Scott, but the certificate of stock was in the possession of the Trust Company apparently as custodian. Mr. Shepley testified that he undertook to act for Mrs. Scott upon his own responsibility and without authority from Mrs. Scott, she being a friend of Shepley's wife and sister, and her deceased husband having been a friend of Mr. Shepley. Apparently, neither the Trust Company nor its Committee on Trust Estates had anything to do with the signing for and inclusion of Mrs. Scott's stock; at any rate, the evidence does not indicate that the committee authorized the signing of the option contract on behalf of Mrs. Scott.

At the time of the signing of this option agreement, G. H. Walker & Company was a partnership engaged in the stock and bond brokerage business. The partners were G. H. Walker and Allen T. West. Allen T. West is a son of Thomas H. West, Sr., a director of defendant Trust Company, and had been an officer of the Trust Company some time prior to 1901 or 1902 (some fourteen years before the date of these transactions) when he resigned his office with the Trust Company to enter the brokerage business. The partnership agreement, dated March 24, 1915, recites that "the said G. H. Walker and other persons have formed a corporation known as Walker, West & Company Investment Company, with an authorized capital stock of $1,100,000, of which $1,000,000. . . . has been issued and paid in." The partnership agreement further provides that the control of said business shall be in G. H. Walker and Allen T. West and that the partnership shall hold, in the name of one of the firm, membership in the New York and St. Louis stock exchanges and furthermore provides "that the cash and securities necessary for all purposes of the partnership business are to be advanced to the partnership by Walker,

West & Company Investment Company, it being understood that said corporation shall bear all expenses and losses connected with said business and shall receive all profits derived therefrom after deducting the expenses of said business, including salaries of partners and employees, which are to be fixed, however, by the President and the First Vice-President of said Walker, West & Company Investment Company, but nothing herein shall be taken as making said corporation or any of its shareholders, other than those who have personally signed these articles of agreement, partners in said firm of G. H. Walker & Company, and it is further agreed by the undersigned that the board of directors of said corporation may at any time cause the business transacted by the said firm of G. H. Walker & Company to be transferred to the name of said corporation and thereafter be conducted by said corporation.'' An agreement, dated March 23, 1915, was entered into between the partnership of G. H. Walker & Company on the one part and Walker, West & Company Investment Company on the other part substantially to the same effect. In 1916, there were thirteen stockholders in Walker, West & Company Investment Company. Three of these stockholders, Robert McK. Jones, J. D. Filley and Benjamin Gratz were at the time directors of defendant Trust Company. Two other stockholders, Allen T. West and W. H. Bixby, are respectively the sons of Thomas H. West, Sr., and W. K. Bixby, and said Thomas H. West, Sr., and W. K. Bixby were also at the time directors of defendant Trust Company. Another stockholder, James H. Wear, is a son-in-law of J. D. Filley, a director of defendant Trust Company. Mr. W. K. Bixby had been a stockholder in G. H. Walker Brokerage Company in 1908 or 1910, prior to the incorporation and organization of Walker, West & Company Investment Company, but had turned his stock over to his son, W. H. Bixby. He was not a stockholder of Walker, West & Company Investment Company in 1916. There is no evidence in the record that defendant Trust Company, or

any of its officers or directors (except the three directors, Jones, Filley and Gratz), or any of the members of its Committee on Trust Estates (unless, possibly, W. K. Bixby), held at any time any stock or pecuniary interest of any kind in the partnership of G. H. Walker & Company, or in Walker, West & Company Investment Company, or in any corporation affiliated with G. H. Walker & Company. The largest individual stockholder of Walker, West & Company Investment Company was Mr. G. H. Walker who held 4,050 shares of the 10,000 issued shares of that corporation. He was not a stockholder in defendant Trust Company. Defendant's Committee on Trust Estates on March 14, 1916, the date of the signing of the Walker option agreement, consisted of seven members, none of whom was a stockholder in the Walker corporation or related to anyone connected with said organization, except W. K. Bixby, the father of W. H. Bixby, and W. K. Bixby, at that time, was not a stockholder in the Walker corporation. Six members of the committee were present on March 14, 1916, when the Walker option was authorized, and the minutes of that meeting show that, at Mr. W. K. Bixby's request, he was recorded as not voting on the proposition. Bixby testified: "I had found through experience that I wanted to be very careful to avoid any possible complications. My son was a stockholder over there, and interested in Walker & Company, and I didn't care to vote." The board of directors of the Trust Company consisted of twenty-five members. At a meeting of the board on April 20, 1916, the report of defendant's trust officer showing the giving of the Walker option was approved by the board. Thirteen members of the board were present at that meeting, including W. K. Bixby, John D. Filley, Robert McK. Jones, and Thomas H. West, Sr., and all present voted to approve the trust officer's report. This meeting was held some time (more than a month) after the Walker option had been authorized by the Committee on Trust Estates, signed by the Trust Company and delivered.

The evidence discloses that, in 1911, Walker & Company, or individual members of that organization, had purchased 133 shares of the Granby Company stock at $102.50 a share, and in November, 1915, had purchased 500 shares of the stock from the Columbia & Fidelity Trust Company of Louisville, trustee for the Ewald estate, at $140 a share. Immediately after the signing of the Walker option on March 14, 1916, Walker set to work to sell the Granby Company stock. According to his testimony, he went to New York, where he approached Judge Gary of the Steel Corporation with a view of selling him the stock, but Judge Gary told him "he was absolutely not interested in the Granby property." Then Walker went to W. E. Corey, president, and Ambrose Mondell, director, of the Midvale Steel Company and sought to interest that company in a purchase of the Granby Company, but they said "they did not consider it time to buy metal companies." Next Walker talked to C. B. Macdonald, Goldman, Sachs & Company, and William Salomen & Company, investment bankers and dealers in securities, but found "the reaction was that metal stocks were high because of the war and it was time to sell rather than to buy them." Subsequently, at the end of March or the first of April, 1916, Walker met H. S. Kimball, president of the American Zinc, Lead & Smelting Company, on the street in St. Louis, and "quite by chance," he says, it occurred to Walker that he might interest the American Company in the purchase of the stock. Walker then took up the matter with Kimball for the first time, laid the facts before him and asked whether Kimball's company would be interested. Kimball told Walker his company might be interested and asked Walker to furnish him some figures, which was done. Kimball returned to New York, took the subject up with the directors of his company and asked Walker to come to New York to talk over the matter. Walker went to New York and met Kimball and Mr. Coolidge, a director of the American Company, when a price of $300 per share was

discussed, provided all the outstanding Granby Company stock could be purchased. Both Kimball and Coolidge made it clear to Walker that they would not buy anything less than all the Granby Company issued stock, they being interested in purchasing the stock only as a means of acquiring the entire physical properties of the Granby Company. Walker returned to St. Louis and told Mr. Gatch, president of the Granby Company, that he thought he had a buyer for all the Granby stock at $300 per share. Gatch then called a meeting of the Granby interests, after which he told Walker that $300 a share was not satisfactory, but they might consider a bid of $350 a share. Walker went to New York and told Kimball and Coolidge the result of his conference with Gatch, and they then agreed to the price of $350 per share, provided they were given an option for a time to examine the properties of the Granby Company. Walker returned to St. Louis and told Gatch he was ready to discuss final terms. Gatch then called a meeting of the Granby interests in Chicago at the Northern Trust Company. Walker, accompanied by his counsel, Judge Daniel G. Taylor, attended the meeting, which lasted two days and resulted in Gatch announcing that they would not sell for $350 a share. Walker then told them of the various steps that had been taken and that their action did not look like good faith to him, whereupon Gatch and his associates announced if they could get $400 a share they would sell. Walker told them he didn't believe the American Company interests would go any farther than they had gone. However, he went to New York and laid the proposal before Kimball and Coolidge. A meeting of the directors of the American Company was called in Boston and a purchase price of $400 a share authorized, provided every share of Granby stock could be purchased and a thirty-day option given to enable the American Company to examine the Granby properties. An option agreement, referred to as the Kimball option, was then prepared, to be circulated among the Granby stockholders for their signatures.

The Kimball option, dated May 1, 1916, granted to H. S. Kimball the right and option to purchase at any time within thirty days from its date the shares of stock in the Granby Company at a price of $400 per share, payable in cash, or at the election of the buyer, $300 a share in cash and $100 per share in first mortgage five per-cent ten-year bonds of the Granby Company out of an issue of bonds limited to $2,000,000 to be secured by the physical properties of the Granby Company. It required the sellers, immediately after signing the option agreement, to deposit with the Northern Trust Company of Chicago, their respective certificates of stock in the Granby Company. Accompanying the Kimball option agreement was a deposit agreement, bearing the same date, requiring the sellers to deposit their respective certificates with the Northern Trust Company and requiring said Trust Company to issue to each stockholder so depositing his stock a trustee's *interim* receipt therefor. The deposit agreement provided for the payment of $25 per share out of the purchase price of $400 per share to defray the expense of compensation and commissions to the brokers and the Northern Trust Company for their services in connection with the sale, thereby netting $375 per share to each stockholder for the sale of the Granby stock. Of the $25 per share deducted for brokerage commissions, G. H. Walker & Company received $10 and the Northern Trust Company received $15 in payment of their services. The Kimball option and deposit agreements, while dated May 1, 1916, were actually prepared some days prior thereto. In view of the fact that every share of the Granby Company stock was essential for the purpose of the American Company, it was necessary to obtain the signatures of all the stockholders of the Granby Company to the Kimball option and deposit agreements. Several duplicate originals thereof were prepared and sent out for that purpose. The agreements were circulated by the directors of the Granby Company and by Walker & Company, and signatures were rapidly secured.

On April 27, 1916, G. H. Walker & Company wrote a letter to defendant Trust Company, calling attention to the Walker option of March 14, 1916, on the 1735 shares of Granby stock owned by the Blanke estate and twenty-five shares owned by Bertha Drake Scott. The letter recited that, since the granting of that option, negotiations had been started with H. S. Kimball for the sale of the Granby Company stock, resulting in an option to Kimball to purchase said stock during thirty days from May 1, 1916. The letter authorized and requested defendant Trust Company to sign the Kimball option and deposit agreements' enclosed therein as trustee of the Blanke estate and for Bertha Drake Scott, and Walker & Company therein agreed "in the event we exercise our option to accept in delivery from you the *interim* receipts for said stock issued by the Northern Trust Company, Chicago, trustee. It is understood that nothing contained in any of said agreements shall be construed to change our rights under the option granted to us." The officers of the Trust Company refused to sign the Kimball option agreement, stating as a reason that "they didn't see how they could sign the Kimball option, because they had outstanding this contract with Walker & Company of March 14, 1916." At that time, defendant was co-trustee with Ida H. Gauss, under the will of Charles F. Gauss, deceased, of twenty shares of the Granby stock. The Trust Company joined with Ida H. Gauss in signing the Kimball option as representing these twenty shares. It also appears that Bertha Drake Scott personally signed the Kimball option as the owner of the twenty-five shares mentioned in the Walker option. It is apparent that Walker & Company could not then sign the Kimball option for the 1735 shares owned by the Blanke estate or the twenty-five shares owned by Mrs. Scott, because Walker & Company had not then exercised their option to purchase the stock and title was not in their name on the Granby Company books. It is evident from the record that Walker & Company never had any intention of exercising their option of March 14,

1916, until Kimball had first exercised his option of May 1, 1916. Walker testified he was not willing to pay $250 a share for the Blanke estate stock unless he had it sold.

On May 1, 1916, most of the stockholders of the Granby Company had signed the Kimball option, and Mr. Edwards of the Northern Trust Company then wrote the attorney for the Granby Company in St. Louis urging that the Kimball option be signed by defendant Trust Company, as trustee of the Blanke estate, for 1735 shares of the stock. On May 2, 1916, Mr. Allen T. West of Walker & Company wrote the defendant: "It is highly important, both for your interest and ours, that you cause to be transferred to our names on the books of the Company the shares of the Granby Mining & Smelting Company covered by said option (March 14, 1916). We will, of course, immediately indorse these certificates in blank and return the same to you and will stand any expense in connection with the transfer. We will then be able to sign as record-holders of the stock the deposit and option agreement dated May 1, 1916, heretofore presented to you for examination. It is, of course, understood that nothing in this letter or in the transfer, in case it is made, shall be construed as in any way affecting your rights or ours under our option contract above referred to, but that this request is made only for our mutual benefit and to facilitate the carrying out of negotiations now pending in connection with said stock."

Mr. Shepley, president at the time of defendant Trust Company, testified that he knew, "unless they (Walker & Company) were put in a position where they could sign the Kimball option, that there was great danger that the whole trade would fall through." Upon receipt of the letter of May 2, the Trust Company on that date caused the 1735 shares of Granby stock held by it as trustee for the Blanke estate to be transferred on the books of the Granby Company to G. H. Walker & Company. A new certificate of stock was then issued in the name of G. H. Walker & Company, immediately, on the same day, as-

signed by them in blank and delivered to the defendant Trust Company, which retained the certificate until May 15, 1916. Nothing was paid to the Trust Company by Walker & Company at the time of such transfer, but Walker & Company immediately signed the Kimball option and deposit contracts as record-holder of the Granby stock. On May 15, 1916, Walker & Company obtained the stock certificate from the Trust Company for the purpose of depositing it with the Northern Trust Company of Chicago under the terms of the Kimball deposit agreement. An *interim* receipt therefor was immediately issued by the Northern Trust Company to Walker & Company and immediately assigned and transferred by Walker & Company to defendant Trust Company, by whom it was held until it received payment for the same from Walker & Company on May 29, 1916.

On May 26, 1916, all of the Granby stock having been then deposited with the Northern Trust Company pursuant to the Kimball option agreement, Kimball notified the Northern Trust Company in writing that he exercised his option to purchase the stock at the price of $400 per share. On the same day, Walker & Company notified defendant Trust Company that they exercised their option of March 14, 1916. By stipulation of the parties, read in evidence by plaintiff, it is agreed that the *interim* receipt of the Northern Trust Company for 1735 shares of the Granby stock was held by defendant Trust Company until it received payment from G. H. Walker & Company on May 29, 1916, and that no money was paid to defendant Trust Company for said 1735 shares of stock until May 29, 1916, on which date G. H. Walker & Company paid to the Trust Company $433,750, the Walker option price of $250 per share for said 1735 shares, and demanded from defendant the *interim* receipt of the Northern Trust Company, which receipt was thereupon delivered by defendant to Walker & Company. It appears that of the $433,750 paid to the Trust Company, Walker & Company paid $83,750 out of their current funds and $350,000 was

borrowed from a St. Louis bank, Walker & Company depositing the *interim* receipt, obtained from the Trust Company upon payment to it of the option price, as security for the loan. Walker & Company received no payment for the stock under the Kimball option agreement until June 5, 1916.

The record discloses that when Shepley, some time after signing the Walker option of March 14, 1916, learned of the Kimball option agreement and that the stockholders of the Granby Company were to receive thereunder $400 per share gross, or $375 per share net, for their stock, he went to Walker and induced him to release from the Walker option the twenty-five shares owned by Bertha Drake Scott and signed for by Shepley, on the ground that Shepley had no authority to sign for Mrs. Scott and had been placed in an embarrassing position in presuming to sign the Walker option in her behalf. Mrs. Scott, having herself signed the Kimball option, received the sale price therein provided.

Representatives of defendant Trust Company also began to press Walker & Company to pay the Trust Company an additional amount over and above the option price of $250 per share for the 1735 Granby shares owned by the Blanke estate. Shepley, Haarstick and Bixby, directors of defendant, at different times called upon Walker urging him to increase the price to be paid for the stock. Walker at first refused their requests, saying that "he thought he had earned the money, and that we (defendant) were getting a good price for the stock, and thought we were doing very well. He wasn't inclined to pay anything additional for the stock." It appears that Kimball and his associates anticipated some difficulty in raising sufficient cash necessary to buy the outstanding issue of Granby stock at $400 per share. The difficulty was suggested to Walker, who agreed to take the notes of Kimball and his associates for $2,000,000 to be secured by a pledge of all the shares of the Granby stock. On June 5, 1916, Kimball delivered the $2,000,000 of notes

to Walker, who negotiated them, or borrowed money thereon, at several St. Louis banks. On June 5, 1916, Walker sold $800,000 worth of the notes to the St. Louis Union Bank at par. The St. Louis Union Bank was owned or controlled by defendant Trust Company, the chairman of the board of the Trust Company being also the president of the St. Louis Union Bank. Walker testified that, when urged by Mr. Bixby to increase the price to be paid for the stock owned by the Blanke estate, he told Bixby "that I would not do it; that we had the option; we had done the work and spent the time and money, and that we were entitled to the stock at $250 a share. After a day or two of conferences on it, he agreed that if. the St. Louis Union Trust Company would take from us— I think it was $800,000 of the notes we had to buy from Kimball—that we would pay the Trust Company $50 a share additional on the stock. Those were the sole influences in the transaction. I was very much opposed to it, naturally, and so were my partners." On June 2, 1916, Mr. Shepley, president of defendant Trust Company, wrote a letter to G. H. Walker & Company, in evidence, as follows: "This is to acknowledge your receipt of June 1, 1916, for certificate for 1735 shares of stock of the Granby Mining & Smelting Company on which you have paid us $250 a share. We confirm the statement following your receipt respecting the obligation to purchase $800,000 in par value of five per cent notes of the Granby Mining and Smelting Company or H. S. Kimball or other person, being part of an issue of $2,000,000 of notes, bearing five per cent interest and maturing on or before January 1, 1917, and secured by deposit of 20,000 shares of the said Granby Mining & Smelting Company." Shepley testified that the agreement to purchase $800,000 of said notes from Walker & Company was one of the inducements to obtain from Walker & Company for the Blanke estate $50 a share for the Granby stock over and above the Walker option price. On June 23, 1916, Walker & Company paid defendant Trust Company the ad-

ditional sum of $86,750, or $50 a share upon the 1735 shares of Granby stock of the Blanke estate, thereby raising the price received by the Trust Company for said shares to $300 a share, or an aggregate amount of $520,500, the receipt of which amount is shown in the accounting of the Trust Company and which sum was reinvested by the Trust Company in other interest bearing securities.

Following the sale, Mr. McMillan, chairman of the board of the Trust Company, requested Mr. Davis and Mr. Shepley to write out the facts and circumstances relating to the sale and each of them wrote a letter to Mr. McMillan, dated May 31, 1916 (after both the Walker and Kimball options had been exercised), relating his recollection of the principal facts. These letters are in evidence and are referred to as "inter-office communications." Such communications, it appears, are not commonly written concerning routine matters. As Shepley explained in his testimony: "No memorandum of that kind would be made respecting routine transactions or transactions respecting which there was nothing unusual. There was something unusual about this transaction. It resulted very unexpectedly in the realization of a price which was never dreamed of, and a compensation to the person obtaining the sale that we never contemplated and was never thought of at the time. Mrs. Blanke's will was still in existence and hadn't been contested, and we had every reason to think that the settlement of this matter would be after the death of most of us who participated in it, and, therefore, we left behind us, not evidence, but information on the basis of which an investigation could have been made."

In Shepley's communication of May 31, 1916, to McMillan, among other things, he said: "I reminded him (Walker) that he had mentioned $300 a share at our interview as about the price at which he had hoped to sell the stock and told him that this company would be put in a very embarrassing position if we should get only $250 a share for the stock and all other shareholders

should get $375, particularly in the light of the relationship of the members of his firm with some of our officers and directors. After several conferences he said that in view of these facts his firm was willing to have the Blanke estate receive $300 a share for the stock if the Kimball option should be exercised, and that he was perfectly willing to have the transaction appear as our conversation originally intended it should be, namely, an employment of his firm to work up a trade on payment to it of all the price received over and above a certain amount, which was $250, and which it has agreed to raise to $300. The option to purchase the stock was given without consideration and merely to put Walker & Company into a position where they could show the right to put the Blanke stock in with that of the Northern Trust Company in this ⋅option trade."

In explaining the above quoted language, which, of course, was written after the Walker and Kimball options had been exercised, Mr. Shepley testified: "Of course, the Northern Trust Company wasn't known at that time to have any connection with this transaction, and I used that expression as the equivalent of anybody who is interested in the purchase of the stock—I designated the Northern Trust Company, but at the time this arrangement with Walker was made nothing was known about Kimball or the Northern Trust Company as prospectively interested in the trade."

It is conceded that no money consideration passed from Walker & Company to defendant Trust Company for the Walker option, but, as Shepley, testified: "The consideration was the promise on the part of G. H. Walker & Company to use the best effort to obtain a purchaser for that block of stock, or dispose of it at that price or better." Walker testified: "I was asked to undertake to sell the company in consideration of being given an option on 1735 shares of stock, plus twenty-five that Mr. Shepley wanted to put in for Mrs. Scott. The consideration for me in undertaking the transaction and

finding a buyer was that I had this option on this block of stock—the main consideration.''

The evidence shows that the Trust Company did not consult with plaintiff or her sons relative to the sale of the Blanke estate stock or the giving of the Walker option. There is some evidence that the Trust Company consulted with the beneficiaries of the Blanke will as to the sale of other stock securities, but it appears that these consultations may have been subsequent to the sale of the Granby stock. Plaintiff apparently learned of the sale of the Granby stock when one of her sons read in a newspaper that the shareholders had received $375 a share for their stock. On November 10, 1916, defendant rendered its semi-annual statement to plaintiff disclosing that the Trust Company had sold the Blanke shares for $300 a share. Harold Loud, plaintiff's son, thereupon went to the Trust Company and talked with Mr. Orr, then president of the Trust Company and formerly its vice-president. He testified: ''I asked him (Orr) why it was we only got $300 a share when I understood that the rest, or that some of the 'others, got $375 a share. He (Orr) said this was an industrial stock and they had to sell it in a hurry, and he had sold it previous to the time the others had sold it and that, for that reason, they didn't get the same price as the others had.'' He further testified that Mr. Orr did not then tell him about the Walker option or the Kimball option.

On the other hand, Orr's version of this conversation is quite different, for he testified: ''I can't recall the words that were said. I have this recollection, that I had before me this letter from Mr. Shepley and Mr. Davis (inter-office communications hereinabove mentioned) and Mr. Walker. I undertook to give these young men (plaintiff's sons) the exact facts. I can't remember what was said—the particular words that were said. My recollection is that I explained to them why they didn't get as much money as these other people. I don't remember that I mentioned Walker & Company's

name at all in the conversation, or Mr. Kimball's name in the conversation. I can't recall that I referred to that as an option or as Walker & Company's option, or just how I described it, but I did explain to them that we had obligated ourselves at a prior date, before this price was developed. I told them the reason that they didn't get the price was because we had practically sold it back in March.''

Some time later, after the institution by plaintiff of the instant suit to set aside the Blanke will, application was made to the Trust Company to increase the allowances to the beneficiaries under the Blanke will. Harold Loud testified that he talked to Mr. Orr in regard to the application and that Orr said ''he had a way that we could get our allowances increased. He said if I would go to you (plaintiff's counsel) and have you have those accounts audited and we would approve the accounts, signing an approval of the accounts up to date, he would increase our allowance in accordance with our written request.'' Orr, however, by his testimony, positively denied that he had made this statement to Harold Loud.

Mr. Semple, a stock broker, testified for defendant that the giving of an option would be the ordinary and reasonable method of procedure with a view to bringing about a sale of the 1735 shares of stock in question and would have a tendency to bring about a sale. Mr. Festus J. Wade, president of Mercantile Trust Company, testified: ''It is quite customary to give options, both as a trustee and for the corporation where it owns it (i. e., the stock) itself.''

The trial court found for plaintiff upon her first exception to defendant's accounting and held that defendant must account to plaintiff for the difference between $300 a share, the price received by defendant for the 1735 shares of Granby stock owned by the Blanke estate, and $400 a share, the gross price named in the Kimball option. By the trial court's finding, defendant was held to account for $100 a share on said 1735 shares, or a total sum

313 Mo. Sup.—38.

of $173,500, without deduction of $25 a share for expenses of sale as provided in the Kimball option and without taking into consideration that the shareholders under the Kimball option received for their stock only $300 a share in cash and took $100 a share in bonds of the Granby Company. The testimony tended to show that these bonds had a market value of not to exceed $75 or $80 on the $100 par value. The decree also allowed plaintiff recovery from defendant of interest on $173,500 at six per cent per annum from June 1, 1916. We have found it necessary to state herein at some length what we deem to be the salient facts bearing upon the several questions of law raised by the parties relating to plaintiff's first exception in order the better to discuss the legal questions raised. Other facts, if found necessary, will be referred to in our opinion.

I.   Was it the duty of defendant to sell the Granby stock, bearing in mind the nature and character of the stock and the obligations imposed by law on a trustee with respect to the retention of unsafe or doubtful investments? We think this question must be answered in the affirmative. The evidence tends to show that the business of the Granby Company was largely the mining and smelting of zinc ores. As stated by the Granby Company in its annual statement for the year 1915, issued in January, 1916, its future prosperity rested upon the development of the mineral possibilities of its large acreage of mining lands in the Joplin district. Unquestionably, the success of the company during the year 1915 was largely because of the World War and the consequent increase in the price of spelter, due to the cessation of the zinc smelters of Germany, France and Belgium. But, as the annual report of the company indicated, "the production of spelter in the United States would doubtless soon be sufficient to take care of the then present spelter requirements of the world" and the "dial of fundamental conditions strictly

*Duty to Sell.*

pointed to lower prices and smaller profits.'' In other words, the future prosperity of the company depended to a large extent upon the duration of the war, which defendant's officers, and those with whom they consulted, thought would not likely continue for many months. These conditions gave to the Granby stock a speculative character in the opinion of defendant's officers. Besides, the previous dividend history of the Granby Company indicated that the stock was not a highly profitable investment for the Blanke estate, having netted but three and one-half per cent annually on the investment during the preceding ten years and having paid but one dividend of two and a half per cent during the years of 1913, 1914 and 1915. By the weight of authority, mining stock is regarded as a wasting investment and it is the duty of a trustee to sell with due diligence wasting investments and convert the same into property of a more permanent and profitable, yet reasonably safe, character. [Underhill on Trusts & Trustees (4 Ed.) p. 232; 1 Perry on Trusts & Trustees (6 Ed.) sec. 439; 28 Halsbury's Laws of England, 128; In re Buhl's Estate, 211 Mich. 124; Babbitt v. Trust Co., 72 N. J. Eq. 745; Villard v. Villard, 219 N. Y. 482; In re Hamersley's Estate, 180 N. Y. Supp. 887; In re Jarvis' Estate, 180 N. Y. Supp. 324.] . The fact that the investment was originally made by the testatrix herself and came to defendant as a part of her estate did not justify defendant in retaining the investment if sound business judgment prompted its sale and reinvestment in other profitable and reasonably safe securities, absent, of course (as in this case) a positive direction in the will that the investment must be continued by the trustee. [17 Am. & Eng. Ency. Law, 454; 1 Perry on Trusts (6 Ed.) sec. 465, and cases cited.]

II.   The crucial legal question in this case is whether defendant had the power, under the terms of the will of Mary Jane Blanke, to give the Walker option. The

power conferred upon defendant by the will is therein expressed: "The trustee shall have power, at any time and from time to time, to sell any of the trust property or estate, for such price or prices and upon such terms and conditions as it may determine. Any money coming into its hands as the proceeds of any such sale or otherwise and forming a part of the principal of said trust estate shall be forthwith invested by it. In making such investments the trustee is given full power to purchase any property, real or personal, which it may think desirable to acquire and hold as part of the said trust estate."

*Power to Sell: Power to Give Option.*

Plaintiff contends (rightly, we think) that defendant must look to the will for its powers in the execution of the trust and the management of the trust estate. She furthermore contends that, while the will confers upon the trustee the discretionary power to sell any of the trust estate, nevertheless the will does not grant the power to give an option; that the power to sell is a mere naked power and cannot be enlarged or construed to include the power to give an option.

It has been ruled by this court that the power of sale conferred by will is a mere naked power and does not include the power to mortgage the trust property (Price v. Courtney, 87 Mo. 387; Dougherty v. Dougherty, 204 Mo. 228); nor does it include the power to give away or exchange the trust property. [Garland v. Smith, 164 Mo. 1; Tallent v. Fitzpatrick, 253 Mo. 10.] It is well established, by the weight of authority, that an option is neither a sale nor an agreement of sale. The distinction between an option, a sale, and an agreement of sale is concisely expressed by James on Option Contracts, section 105, in this language: "A sale is the transfer of the property in a thing for a price in money. A sale also contemplates the transfer of the possession of the thing. An agreement of sale is a contract by which the seller agrees to sell, and the buyer agrees to purchase, the property in a thing for a price in money. The distinction,

therefore, between a sale, or an agreement of sale, on the one hand and an option contract on the other, is very apparent. An option contract does not bind the optionee to purchase the property. An agreement of sale does. The thing directly contracted for, in an agreement of sale, is the property; in an option contract, it is the right of election to purchase the property.''

This distinction has been recognized by this court. [Montgomery v. Hundley, 205 Mo. 138.] In Ramsey v. West, 31 Mo. App. 676, and Glass v. Rowe, 103 Mo. 513, it is held that specific instructions given by letter to a real estate broker to sell land does not authorize him to give an option. However, we have not found, nor has diligent counsel directed our attention to, any decision of any appellate court of this State ruling the precise question now before us.

Plaintiff has cited several text-books, together with decisions from other and foreign jurisdictions, in support of her contention that defendant, under the powers conferred by the Blanke will, had no power to give an option to Walker & Company upon the Granby stock. In 28 Halsbury's Laws of England, page 150, it is said: ''A trustee having a power or trust for sale cannot give to a lessee or other person an option of purchase for a definite sum at a future date, since, if the property increases in value in the meantime, the trust estate will lose the increment, while if it deteriorates, the option will not be exercised.'' And, in 26 Ruling Case Law, p. 1290, section 140, it is said: ''A trustee cannot be permitted to deprive himself of a power to sell conferred for the benefit of the trust, or so to fetter its exercise by himself or his successor as to defeat the purpose of the trust. Accordingly, a trustee with a power to sell is not authorized to give a long-term option to another to buy and thereby bind the estate so that it cannot be sold in the meantime.''

In most of the cases cited by plaintiff, the option was coupled with, and was an integral part of, a long-term lease of real property. It does not appear in those

cases that the chief or main purpose of the trustee in giving the option was to bring about a sale of the property; nor does it appear that the giving of an option was the only way in which a sale could have been brought about. In other words, apparently the option was given in each instance merely as an incident to the lease and the option ran for a long period of time. For instance, in Oceanic Steam Navigation Company v. Sutherberry, an English case, 16 Law Reports (Chan. Div.) 236, the option was for seven years; in Clay v. Rufford, also an English case, 5 DeG. & Sm. 768, twenty-one years; Hickok v. Still, 168 Pa. St. 155, 31 Atl. 1100, three and a half years; Moore v. Trainer, 97 Atl. (Pa.) 462, ten years; In re Armory Board, 60 N. Y. Supp. 882, twenty years; Slaughter Cattle Company v. Potter County, 235 S. W. (Tex.) 295, five years; and Midland County v. Slaughter, 130 S. W. (Tex.), 612, twenty years. In each of those cases, the apparent logic and basis of the court's decision, in denying the power of the trustee to give an option, was that it is the duty of the trustee to sell within a reasonable time (or immediately, as directed by the will in one of the cases), and that the sale price fixed at the date of giving the option would be binding upon the trustee, or his successor, at a distant future date, regardless of the real value of the property at that future date, thereby depriving the trustee of the exercise of his judgment whether the sale is beneficial or not at that time.

The rule announced in the two Pennsylvania cases cited by plaintiff, Hickok v. Still and Moore v. Trainer, supra, seems to have been somewhat shaken by the later case of Cardon's Estate, 278 Pa. St. l. c. 157, wherein a power of attorney authorized an attorney-in-fact "to sell, lease, rent, or dispose of any real estate of which I am now seized or possessed in fee simple, or for any less estate to any person or persons, for any price and in any manner whatsoever and for these purposes to execute and acknowledge any deed or deeds, lease or leases, and for such purposes, to make and execute in my name all such

contract or contracts, or other instruments whatsoever which he may deem meet or desirable, to make leases for the same on such terms as to him may seem meet and proper and generally to execute all contracts requisite or proper to effectuate any of the premises, with the same powers and to all intents and purposes with the same validity as I could if personally present." The attorney-in-fact gave a lease for fifteen years with an option to the lessee to purchase the property at any time during the first five years of the lease. In holding the option valid, the court remarked at page 157: "Appellant contends that, although the power of attorney gives an undoubted authority to sell real estate, it does not include authority to give an option. We think this is entirely too narrow a construction of that paper. . . . This instrument gave the attorney a wide latitude in dealing with his principal's property. He could sell it 'in any manner whatsoever' and an option is certainly a manner of sale and a very ordinary and usual method."

Plaintiff cites Trogden v. Williams, 144 N. C. 192, wherein the option period was ninety days, as authority for her statement herein that the length of time of the option—whether for a long or short term—has no bearing upon the general principle of law contended for, namely, that the power to sell does not include the power to give an option. However, the same court in a subsequent opinion, Cozad v. Johnson, 171 N. C. l. c. 643, in which Trogden v. Williams, is cited, uses this significant language: "It may be that an option given for a short and definite period according to customary methods and with a view of promoting in effect a present and advantageous sale would not necessarily be disapproved." Plaintiff cites several cases involving special agencies rather than trusteeships, wherein it is held that a special agent has no authority to give an option. While these cases are somewhat persuasive, we do not regard them as controlling upon the question at issue.

The Supreme Court of Oregon, however, in a comparatively recent decision, Crown Company v. Cohn, 88

Ore. 1. c. 645, has squarely ruled that a trustee has the power to give an option under a trust deed which authorized the trustees therein named "to take possession of said property, manage and control the same, lease, mortgage, sell or convey the same, and to re-invest the proceeds thereof in such other property or securities as to my said trustees shall be deemed advisable." The trustees leased certain real property conveyed to them by the trust deed for a term of thirty years, requiring the lessee to erect thereon at its own expense within five years a building to cost not less than $75,000, and granting to the lessee an option of purchase at any time within the first five years of the demise at a fixed price, and at each subsequent year an additional price, until the tenth year of the lease, when the option should end. Said that court, at page 656: "It is contended by plaintiff's counsel that the option attempted to be granted to their client, to purchase the property, was not an exercise of the power conferred upon the defendants to sell and convey the premises, for such authority does not include power to grant an option to purchase the real property. The strongest case cited to support the principle so insisted upon will be examined. Thus in Hickok v. Still, 168 Pa. St. 155, 31 Atl. 1100, it was ruled that a trustee was not permitted to deprive himself of a power of sale conferred for the benefit of the trust; nor so to fetter its exercise by himself or his successor as to defeat the purposes of the trust. . . . The trust deed herein did not contain, as the provisions of the will in the last case, a command to dispose of the real property in any designated time. By the express terms of their mother's conveyance the defendants were empowered to take possession of, manage, control, lease, mortgage, sell and convey the land and invest the proceeds thereof 'as to my said trustees shall be deemed advisable.' . . . The covenant to put up the building was a sufficient consideration for the option, which right of election was not void for any lack of authority on the part of the defendants to grant it." This seems to be one

of the most recent announcements on the legal question herein involved.

Opposing plaintiff's contention, defendant maintains that, where the authority is general to perform and carry out a particular object, a resort to the ordinary and usual methods or means comes within the scope of the power and it will always be inferred that a testator intended to give his trustee every authority which is necessary for his declared purpose. Defendant's contention in this respect seems to be amply supported by authority. [Faulk v. Dashiell, 62 Tex. 1. c. 648, and cases there cited; Cardon's Estate, 278 Pa. St. 153; Schloendorn v. Schmidt, 115 Md. 1. c. 79 and cases cited; Preston v. Safe Deposit & Trust Co., 116 Md. 1. c. 217; Smith v. Allen, 86 Mo. 178.]

In Drake v. Crane, 127 Mo. 85, a will conferred upon the trustees the power "to enter into the possession thereof (the trust estate), immediately after my death, collect the rents, with full power, subject to the limitations hereinafter imposed, to sell, lease, manage and dispose of the same, and to invest and reinvest the proceeds of the sale thereof, and to do all and singular with respect to said real estate and the management thereof, and the investing and reinvesting of the proceeds of sales thereof, as I might lawfully do if living." The will provided for a reserve fund to be set aside and retained by the trustees to guard against losses of shrinkage in the value of the real estate, or by other contingencies, and to be invested and re-invested from time to time until the termination of the trust. The trustees contributed $22,400 out of the reserve fund to a fund of $200,000 subscribed by various property owners to secure the location of the Planter's Hotel in St. Louis opposite certain of the trust property. Beneficiaries of the trust challenged the power of the trustees to make the subscription under the special powers granted by the will. This court found that the location of the hotel would be beneficial to the trust estate and would have a tendency to stop the shrinkage of values of real estate in the neighborhood, and that the

subscription was in a sense an investment, although the estate acquired no interest in the hotel property. We then said, at page 108: "Our conclusion is that, by the provisions of the will, power was conferred upon the trustees therein named to make the subscription to the Commonwealth Realty Company, to be paid out of said reserve fund for the purpose of procuring the location and erection of the hotel on the site of the old Planter's Hotel, and that the court below correctly so held; but it has been with much hesitancy that we arrived at this conclusion."

Stating defendant's position in the language of its brief, it is "that whenever a trustee for sale, with full authority to sell and under an imperative duty to sell, is confronted with a situation in which the giving of an option as a means and method of effectuating the sale is essential to the execution of the authority and the performance of the duty to sell, then the general rule that mediate powers are always implied authorizes the giving of an option as a thing necessary to the performance of the trustee's duty and to the making of a sale." The Blanke will authorized defendant "at any time and from time to time, to sell any of the trust property or estate, for such price or prices *and upon such terms and conditions as it may determine.*" We think that the evidence tends to show that the Granby stock was of a speculative character and that it was not a profitable asset of the trust estate. Under such circumstances, we believe, and have so ruled, that it was the duty of defendant trustee to sell the same; at least, the will gave the trustee the discretionary power to sell the same. The record tends to show that, over a period of several months, the defendant through its officers made efforts to sell the stock, but were unable to find a purchaser or even get a bid therefor. The only chance of selling the stock seemed to be dependent upon the giving of the Walker option. The option was for a comparatively short period of time, approximately three and a half months, and the price fixed there-

in, $250 a share, greatly exceeded any price that had been previously paid for the stock. At least two witnesses testified herein that it was the ordinary and reasonable method of procedure and practice to give an option with a view of bringing about a sale. Under such circumstances, we believe that defendant was justified in resorting to the ordinary and usual method of giving an option for a comparatively short time at an apparently then reasonable price in an endeavor to bring about a sale of the stock under the powers conferred by the Blanke will.

While the question is not entirely free from doubt, nevertheless, after an exhaustive review and analysis of the many cited authorities bearing thereon, we have arrived at the conclusion that defendant, under the powers conferred upon it by the Blanke will, had the mediate right and power to give the Walker option.

III.  Plaintiff urges that the Walker option was without consideration and, hence, that it was unenforcible and voidable. It is conceded that no money consideration passed from Walker & Company to defendant at the time of giving the option contract. Plaintiff refers to the inter-office communication of Shepley to McMillan, wherein Shepley wrote that "the option to purchase the stock was given without consideration," as an admission by defendant that there was no consideration for the option. The option agreement recited on its face that it was given for $5 and "other good and valuable consideration." Shepley testified that, while no money consideration passed to defendant upon the giving of the option, a consideration for the option was the promise on the part of Walker to use his utmost efforts to sell the stock, and Walker testified, "the consideration for me in undertaking the transaction and finding a buyer was that I had this option on this block of stock, the main consideration." The testimony tends to show that Walker, immediately after

*Consideration for Option.*

the giving of the option, set about to find a purchaser for the stock and made several trips at his own time and expense to New York and elsewhere in endeavoring to bring about a sale. We think there was mutuality of obligation to support the option contract. [Warren v. Coal Co., 200 Mo. App. 442.] Besides, even though the Walker option may have been unilateral in its inception, when Walker, in reliance thereon, expended time and money in endeavoring to procure a purchaser for the stock, such acts upon his part, under the holdings of this court and our courts of appeals, made the contract bilateral and binding upon both parties. [Mercantile Trust Co. v. Lamar, 148 Mo. App. 353; Underwood Typewriter Co. v. Realty Co., 118 Mo. App. 197; idem. 220 Mo. 523.]

IV. Plaintiff contends that, by reason of the relationship existing at the time between certain of the directors of defendant Trust Company and the Walker organization, the Walker option is voidable at the election of plaintiff. It is unquestionably an established rule of law that an individual, in the capacity of a trustee, may not sell to himself, to an immediate relative, or to an intermediary or "straw party" acting in his behalf or for his benefit, and that such a sale of trust property is voidable without proof of actual fraud. But, none of those situations applies in this case, for this is not a case of an *individual* (as distinguished from a corporate) trustee selling to himself, or to any of his relatives, or to a corporation in which he is a director or a stockholder. We reiterate briefly the facts bearing upon this contention. G. H. Walker & Company was a partnership, consisting of G. H. Walker and Allen T. West. Walker, West & Company Investment Company was a corporation, which by agreement with the partnership, bore all the expenses and losses and received the profits of the partnership. Defendant Trust Company is a corporation. Its board of directors consisted of twenty-five members, three of which number, R.

*Sale by Trustee to Itself.*

McK. Jones, J. D. Filley and Benjamin Gratz, were stockholders at the time in Walker, West & Company Investment Company. Two of its directors, Thomas H. West, Sr., and W. K. Bixby, are the fathers respectively of Allen T. West and W. H. Bixby, which sons were stockholders at the time in Walker, West & Company Investment Company, as was also James H. Wear, a son-in-law of J. D. Filley. Defendant, as a corporate entity, owned no stock and had no pecuniary interest in either the Walker partnership or the Walker corporation. The directing head and principal stockholder in the Walker corporation was G. H. Walker, who was neither a stockholder nor director in the Trust Company, nor was he related to any officer or director of the Trust Company. Defendant's Committee on Trust Estates consisted of seven members. The by-laws of the Trust Company provided that said committee "shall have general supervision of the management, sales and other disposition of all trust estates, and of the investment of all trust funds or other property deposited with the company for investment. . ., . It *may* take recommendations to and seek advice from the Executive Committee, Board of Directors or any officers of the company *at its pleasure.*" (Italics ours.) The Committee on Trust Estates voted to give the Walker option at a meeting held on March 14, 1916, attended by six of the seven members of the committee. No member of this committee was a stockholder in the Walker corporation or related to anyone connected with the Walker organization, except W. K. Bixby, and he, at his own request, was recorded as not voting, although he was not at that time a stockholder in the Walker corporation. The Walker option was signed and delivered by Mr. Shepley, president of the Trust Company, on that same day. It was not until April 20, 1916, more than a month thereafter, that defendant's board of directors approved the report of its trust officer, which report consisted of some twenty, or more, items of sales or investments pertaining to various trust estates, including the giving of

the Walker option on the Granby stock of the Blanke estate. Thirteen members of the board, including Bixby, Filley, Jones and West, attended that meeting, and all present voted to approve the report of the trust officer. Do these facts render voidable the Walker option?

Plaintiff asserts that, although the Walker option was authorized by defendant's Committee on Trust Estates and although no member of that Committee who voted to give the Walker option was a stockholder or interested in any way in the Walker organization, nevertheless the statutes of this State required the directors of the Trust Company to approve the sales of all securities and, hence, the action of the Trust Committee was

Statute. not legal or binding until approved by defendant's board of directors. The statutes plaintiff relies upon relate to trust companies, and are as follows:

"The affairs and business of the corporation shall be managed by a board of directors or managers, consisting of not less than five nor more than thirty shareholders," etc. [Sec. 11813, R. S. 1919.] And, "The board of directors of each and every trust company organized or doing business under this article shall hold a regular meeting at least once each month, and keep a written record of its approval or disapproval of each and every purchase and sale of securities," etc. [Sec. 11818, R. S. 1919.]

Defendant, on the other hand, maintains that its directors had the power, without statutory authority, to delegate to its Committee on Trust Estates the "general supervision of the management, sales and other disposition of all trust estates" and that said committee had legal power to authorize the giving of the Walker option, which became legal and binding upon its execution and delivery by the president of the Trust Company, without the approval or further action of the board of directors. In this contention, defendant apparently has the support of respectable authority. [7 R. C. L. p. 447, sec. 433; Jones v. Williams, 139 Mo. 1.] If the Committee

on Trust Estates had legal power to vote the giving of the Walker option without the approval, or other action, of the directors of defendant Trust Company (which the above cited authorities apparently hold), then it seems to be reasonably clear, under the evidence, that no officer, director or committeeman of the Trust Company having any interest of any kind, directly or indirectly, in the Walker organization, or who might have received any profit or benefit out of the sale of the Granby stock, participated or acted in the giving of the Walker option.

However, we think that the mere fact that three (out of twenty-five) of defendant's directors were stockholders in the Walker organization and two other directors were related to members of the Walker organization does not render the transaction presumptively or constructively fraudulent and voidable for that reason. In Cornet v. Cornet, 269 Mo. 298, an individual

**Remote Relationship.** trustee loaned money of the trust estate to a corporation in which he was a stockholder. The beneficiary of the trust insisted that the transaction was equivalent to the use of the money by the trustee in his own business and was, therefore, voidable. This court ruled the contention against the objector, saying at page 331: "The money was not used by the defendant, but was loaned to a corporation having a distinct entity both in fact and in law. Were the rule inflexibly applicable to such a case the loaning of trust money to a corporation in which the trustee owned a single share of stock would, however profitable and advantageous to the estate, subject him to all the pains and penalties attached to a willful breach of trust."

In Hardwick v. Jones, 65 Mo. 54, a sheriff sold property taken under execution to a bank in which he was a stockholder. Held, the sale was not voidable.

In Wann v. Scullin, 210 Mo. 429, defendant was a stockholder in a railroad corporation which purchased the stock of the Wiggins Ferry Company. He was also a stockholder in a trust company which represented the

purchaser of the stock on a commission basis. Defendant, as agent of plaintiff, signed an agreement obligating plaintiff to sell her stock in the Ferry Company at $500 per share. After the sale of plaintiff's stock, the price advanced rapidly so that some stockholders received as much as $1525 per share for their holdings. Plaintiff sought to recover her alleged damage from defendant upon the theory that defendant was a stockholder in the purchasing corporation and did not disclose that fact to plaintiff. In denying plaintiff's right to recover, this court said, after reviewing the authorities upon the subject (l. c. 485): "So that it cannot be said without qualification that the mere fact that one is a stockholder in a corporation entirely disables him from representing a third party in a business transaction with such corporation. Numerous well-considered cases hold that a corporation is a legal entity distinct for the purposes of its contracts from the persons who own its stock, and the fact that the same person is president of two corporations will not of itself invalidate dealings between the two corporations as a matter of law, nor make the contract into which they enter void *per se,* but affords a ground for subjecting it to the closest scrutiny by the courts when challenged by a party entitled to challenge it. [3 Thomp. Corp., sec. 4079, and cases cited; Van Dusen-Harrington Co. v. Jungeblut, 75 Minn. 298.]" To like, or similar, effect are Cummings v. Parker, 250 Mo. 427, and Hill v. Gould, 129 Mo. 106.

We have given thoughtful consideration to Brooker v. Trust Co., 254 Mo. 125; Ehlers v. Banker's Fire Ins. Co., 189 N. W. (Neb.) 159; Cartwright v. Trust Co., 23 N. M. 82; Gay v. Mercantile Institution, 37 Utah, 280; Purchase v. Deposit & Trust Co., 81 N. J. Eq. 344; Bank v. Walkley, 53 So. (Ala.) 830, as well as the many other cases cited by plaintiff, and find that, upon the facts and circumstances, they are distinguishable from the case at bar and inapplicable to the facts herein. In several of the cases chiefly relied upon by plaintiff in support of her

contention, a corporate trustee dealt directly with, and made a sale or option to, one of its own directors, who profited thereby, a fact and circumstance, we think, differentiating those cases from the instant case. We believe the relationship existing between certain of defendant's directors and the Walker organization is too remote to invalidate or render voidable the Walker option in the absence of proof of actual fraud or bad faith upon defendant's part.

The evidence shows that neither plaintiff nor her sons, beneficiaries of the trust, were consulted by defendant's officers before the giving of the Walker option or the sale of the Granby stock, and plaintiff insists that this circumstance is indicative of bad faith upon defendant's part. We do not regard this circumstance as evidence of bad faith, for the Blanke will did not require defendant to consult the beneficiaries in making a sale of any of the trust property. An examination of the will discloses that the trust created thereby was in the nature of a "spendthrift trust," indicating that it was the intention of the testatrix to substitute the judgment of the trustee for that of the beneficiaries in the management and sale of the trust estate. By the terms of the will, defendant was granted the power to sell any of the trust property according to its own judgment. It certainly was not necessary, as a matter of law, for the trustee to consult with plaintiff or her sons, or to obtain their consent to, or approval of, such sales. Hence, it cannot be charged with bad faith in failing so to do.

Neither do we see any evidence of bad faith in the fact that Shepley obtained the release from the Walker option of the twenty-five shares of Granby stock owned by Bertha Drake Scott. The inclusion of the Scott shares in the Walker option was the personal act of Shepley and not of defendant, for it is clear that defendant, by its Trust Committee, did no more than authorize the giving of an option upon the 1735 shares of the Blanke estate.

313 Mo. Sup.—39.

. Nor do we think the fact that the Trust Company succeeded in obtaining from Walker & Company the additional sum of $50 per share above the option price for the stock of the Blanke estate is indicative of bad faith on defendant's part. Whether the act of Walker & Company in paying defendant the additional sum of $50 per share for the stock was an act of grace on Walker's part or was induced by the agreement of the Trust Company, or its subsidiary, the St. Louis Union Bank, to purchase from Walker $800,000 of the Kimball notes, has no direct bearing upon the legality of the Walker option or the good or bad faith of defendant. The successful efforts of representatives of defendant to get Walker & Company to pay more for the stock than the option required is rather strong evidence that neither defendant nor its officers anticipated, at the time the option was given, that Walker & Company would make a sale to Kimball or any other subsequent buyer at any such price as $375 per share net. At least, their action in obtaining the additional amount of $86,750 for the stock is not indicative of any disloyalty to the Blanke estate. A scrutinous examination of the record on our part discloses no positive or convincing proof of fraud or bad faith upon the part of defendant or any of its officers in the giving of the Walker option.

V. Plaintiff contends that, since the trust under which defendant held the Granby stock and made the sale in question has been declared void by this court as violating the rule against perpetuities, therefore, the property belonged absolutely to plaintiff from the date of death of Mrs. Blanke, the testatrix; that defendant is bound to know the law; and hence it was a mere custodian of the stock and had no right or power to sell the stock without plaintiff's consent. Plaintiff cites Ashley v. Winkley, 95 N. E. (Mass.) 932, and Pierce v. Prescott, 128 Mass. 140, as supporting her contention. Those cases, in our opinion, do not

<span style="margin-left:2em">Additional Price.</span>

<span style="margin-left:2em">Void Trust: Sale without Consent.</span>

rule the point contended here by plaintiff. This court said on the former appeal of this case, Loud v. Trust Company, 298 Mo. l. c. 185: "This is a very complicated case, and *unquestionably a trust estate was created by the Blanke will,* and it was but natural and proper for the trustee to employ counsel and have the record and briefs printed. If this was not permissible, then it might be with some difficulty that proper persons could be found who would act as trustee." It is undeniable that plaintiff acquiesced in defendant administering the trust and raised no question as to the validity of the trust until almost four years after the sale of the Granby stock. An admission of this fact was made by plaintiff's counsel, on her behalf, at the trial and is set out in the record. Acting at the time under the powers conferred upon it by the Blanke will and believing (as we think it had a right to believe) that the trust created by the will was valid, the Trust Company should not be held liable for the sale of the stock because some years afterward the trust is held void.

We therefore held that the trial court erred in finding for plaintiff and against defendant upon plaintiff's exception numbered 1 to defendant's account (relating to the sale of 1735 shares of the capital stock of the Granby Mining & Smelting Company) and in entering a decree surcharging defendant's account as trustee with the sum of $173,500 and interest thereon. Plaintiff's Exception No. 1 must be overruled and disallowed.

VI. Plaintiff's Exception No. 2 relates to the compensation allowed defendant for its services in the administration of the trust. The account filed by defendant shows that it has paid to itself and taken credit for **Compensation.** commissions as compensation for its services from November, 1914, to November, 1919 (immediately before the institution of this suit), in the sum of $15,031.94, and that since the filing of this suit it has paid to itself and taken credit for commissions from February, 1920, to June 12, 1923, the date of its final ac-

counting, in the sum of $13,755.79, making an aggregate of $28,787.73, for which aggregate amount defendant takes credit in its account.  These commissions are computed upon the basis of five per cent upon the distributed income of the trust estate.  Defendant, upon the filing of its account, prayed a further allowance of $57,162.43 as compensation for its services as trustee, which latter amount is computed upon the basis of five per cent upon the *corpus*, or principal of the trust fund, disbursed on termination of the trust.  The evidence is to the effect that the usual and customary charge or compensation paid to trustees for similar services is five per cent upon the income of the trust distributed to the beneficiaries, and five per cent upon the *corpus*, or principal, of the trust fund disbursed upon the termination of the trust.  The trial court, by its decree, found in favor of defendant and against plaintiff upon the issues joined upon plaintiff's Exception No. 2 (relating to the compensation paid to itself by defendant) and overruled said exception, and allowed defendant, upon its application for additional compensation as trustee, upon the termination of the trust, the sum of $22,000 in addition to the compensation for which it had theretofore taken credit in its account. The decree also allowed defendant the sum of $1099.19 as compensation for its services from June 14, 1923 (the date of filing its final accounting), to November 19, 1924, the date of entering the decree.

Plaintiff complains of the allowances to defendant *in toto,* on the ground that, where a trustee is guilty of maladministration, he is not entitled to any compensation for his services.  Our ruling on the first exception necessarily disposes of this contention and it is ruled against plaintiff.  However, plaintiff furthermore contends that the account of the Trust Company should be surcharged with the sum of $13,755.79 paid to itself as commissions for its services after the institution of this suit, and that the trial court erred in allowing defendant the additional sum of $22,000 as compensation for its

services as trustee and also the sum of $1,099.19 for services from the filing of its account to the date of entry of the decree. The latter contention is made by plaintiff on the ground that defendant received notice of plaintiff's claim that the trust was void upon the institution of the instant suit, and it was bound to know that it was acting under a void trust. In Loud v. St. Louis Union Trust Co., 298 Mo. 148, we strongly intimated that "unquestionably a trust estate was created by the Blanke will" and that it was natural and proper for the trustee to employ counsel in an endeavor to uphold the validity of the trust. In Beck v. Kinealy, 89 Mo. App. l. c. 425, Goode, J., said: "The rule is to allow trustees, in instruments which have been set aside for legal flaws, reasonable credits for such services and disbursements as were rendered in collecting the assets, converting them into cash and other measures for the preservation of the estate," and the court cited ample authority in support of the rule. To like effect are Kelly v. Nichols, 18 R. I. 62, 19 L. R. A. 413; Rothschild v. Dickinson, 169 Mich. l. c. 209; and In re Scrimger's Estate, 188 Cal. 158.

Defendant, on the other hand, maintains that the trial court should have allowed the full compensation prayed by defendant and erred in not so doing. However, the compensation allowed a trustee for services seems to rest in the sound discretion of the chancellor. [39 Cyc. 492; 26 R. C. L. 1392.] We cannot say that the trial court has abused its discretion in this instance. We find no error in the action of the trial court in overruling plaintiff's Exception No. 2 and in making and ordering the additional allowances of compensation to defendant in the respective amounts shown by the decree.

VII. Plaintiff's Exception No. 3 relates to allowances to defendant for attorney's fees and court costs. On March 19, 1921, defendant was allowed by the circuit court the sum of $15,000 for services of its counsel in defending the validity of the trust raised by this ac-

tion. This amount was paid by defendant to its attorneys on June 14, 1921, and it takes credit for such payment in its account. Plaintiff asks that the account be surcharged with that amount and objects to defendant's claim for additional allowances for attorney's fees for services of its counsel in this court upon the first appeal of this action and for services of counsel in defense of its accounting in the trial court and the trial on plaintiff's exceptions thereto. The trial court, by its decree, overruled plaintiff's Exception No. 3 and approved the credit taken by defendant for the sum of $15,000, under date of June 14, 1921, in its account filed. The decree also found against plaintiff and for defendant upon defendant's application for additional attorney's fees, fixing the amount for which defendant is entitled to take credit for services due its counsel in defense of the validity of the Blanke will in the Supreme Court of Missouri at the sum of $5,-000, and further fixing the amount for which defendant is entitled to take credit for services due its counsel in making its accounting and in the trial of plaintiff's exceptions thereto in the circuit court at the sum of $10,000. The decree *nisi* also taxes the costs against plaintiff.

Upon the former appeal, this court directed the circuit court to enter a decree requiring plaintiff to pay the reasonable attorney's fees and costs for the services rendered by defendant's counsel in the circuit court and in this court, together with all costs of the case. [Loud v. Trust Co., 298 Mo. l. c. 185.] Our ruling upon the former appeal became the law of the case and no error was committed by the trial court in overruling plaintiff's Exception No. 3 and in allowing defendant to take credit in its account for the sum of $15,000 paid to its counsel under date of June 14, 1921, and in fixing the amount to which defendant is entitled to take credit for services of its counsel in this court upon the former appeal at the sum of $5,000. Neither did the trial court err in fixing the amount for which defendant is entitled to take credit for services due its counsel in filing its account and in the

preparation and trial of plaintiff's exceptions thereto in the circuit court at the sum of $10,000. This court has held, in Jacobs v. Jacobs, 99 Mo. 427, that an executor, who, of course, is necessarily a trustee, is entitled to an allowance for attorney's fees in defending his final settlement of the trust. The allowances to defendant for attorney's fees are supported by the testimony of two prominent members of the St. Louis bar as reasonable. The costs were properly assessed against plaintiff in accordance with our ruling upon the former appeal.

It follows that the accounts of defendant Trust Company, as filed, should be approved and that the additional allowances made by the trial court to defendant for its compensation and also for attorney's and counsel fees should stand.

The decree of the circuit court is accordingly reversed and the cause is remanded with directions to the circuit court to enter a final decree herein in accordance with this opinion. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.